Michael P. **MOORE**, Plaintiff–Appellant,

v.

**CALIFORNIA INSTITUTE OF TECHNOLOGY JET PROPULSION LABORATORY**, Defendant–Appellee.

No. 00–55958.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 7, 2001

Filed Jan. 4, 2002

Joseph Andrews, Andrews & Hensleigh, Los Angeles, California, for the plaintiff-appellant.

James A. Zapp and Elena R. Baca, Paul, Hastings, Janofsky & Walker, Los Angeles, California, for the defendant-appellee.

Before: PREGERSON, REINHARDT, and SILVERMAN, Circuit Judges.

PREGERSON, Circuit Judge:

Plaintiff–Appellant Michael P. Moore ("Moore") appeals the district court's grant of summary judgment in favor of his former employer, Defendant–Appellee California Institute of Technology Jet Propulsion Laboratory ("JPL"), regarding

Moore's retaliation claims against JPL under the False Claims Act, 31 U.S.C. § 3730(h), and the Major Fraud Act, 18 U.S.C. § 1031(h). Moore, who specialized in large antenna mechanics, told the National Aeronautics and Space Administration ("NASA") Inspector General that he suspected fraud at JPL involving a large antenna JPL was building for NASA. Afterwards, JPL made several proposals to Moore concerning his work with JPL that he alleges were retaliatory. For example, JPL proposed that Moore transfer to another group without being able to take with him the projects he had been working on. JPL also proposed to eliminate Moore's job title and put him under an intermediate supervisor. Because Moore protested, none of these proposals were implemented. The District Court held that these proposals did not amount to retaliation, because they were not "clearly unreasonable, such that an objective observer would understand that the proposal was nothing more than a means of harassing the employee." As an alternative ground for granting summary judgment on the False Claims Act claim, the district court held that Moore's conduct was not protected under the False Claims Act because the suspected fraud at JPL was not "directly related" to any government payment and could, therefore, not have possibly resulted in a False Claims Act case. We have jurisdiction pursuant to 28 U.S.C. § 1291 and reverse.

## I.

From 1991 until his resignation in 1996, Moore worked for JPL as an engineer who specialized in the mechanical aspects of large antennas. The Department of Defense and the National Security Administration hired JPL to investigate structural problems that had arisen in connection with two large antennas which an outside contractor, GTE, had built for Department of Defense and National Security Administration in Puerto Rico. JPL assigned the task to Moore, who concluded that there were problems with the gears that moved the antennas and that the gears needed to be replaced. The investigation lead to an indictment of GTE under the Major Fraud Act. Moore was asked to be a technical witness for the government.

Moore also concluded that there were similar problems with the gears of an antenna JPL was building for NASA. Moore recommended replacing the gears. The gear manufacturer and an independent expert, Don McVittie ("McVittie"), also recommended replacing the gears. On November 1, 1995, Moore's immediate supervisor, Chris Yung ("Yung"), approved a lien on the transfer of the antenna which indicated that the gears needed to be replaced before the antenna could be delivered to NASA. The lien was given to Allied Signal, an outside contractor who acted as a monitor. When Allied Signal was satisfied that the problem had been solved, it would release the lien. Only then would JPL be able to transfer the antenna to NASA.

On November 8, 1995, Yung and others at JPL unsuccessfully tried to convince McVittie to change his recommendation that the gears needed to be replaced. On November 29, 1995, JPL circulated an internal memo that stated that for JPL to make a good impression on NASA, JPL needed to deliver the antenna to NASA as scheduled, i.e., no later than January 15, 1996. JPL's contract with NASA covering, *inter alia*, the antenna project provided for a fixed Base Allowance of $6,000,000 and a discretionary Incentive Award of up to $12,000,000. The November 29 memo also stated that "[l]iens should only be used sparingly, and prompt action must be taken to ... close them in a timely man-

ner." On the same day, Robert White ("White"), the project manager who together with Yung was primarily responsible for completion and transfer of the antenna, sent a memo under his and Yung's names to Tony Brydon ("Brydon") at Allied Signal, the outside contractor responsible for releasing the lien on the antenna. The memo stated that "there is NO problem with the structural integrity of the gears." The memo further stated that "there currently is no need . . . to replace the gear[s] . . . in the foreseeable future." When Brydon asked JPL for McVittie's report, JPL sent him the report but omitted the pages on which McVittie recommended replacing the gears.

Moore became concerned because as a technical witness in the GTE litigation, he planned to testify that misaligned antenna gears had to be replaced. He was concerned because he might also have to reveal that his employer had concluded that similarly misaligned antenna gears did *not* have to be replaced. Moore felt that his employer's view might somehow undermine the government's case. Moore consulted Sandra Cooper ("Cooper"), an attorney in JPL's general counsel's office. Cooper told Moore that he should reveal the problem to the Assistant U.S. Attorney and that as a whistle blower, he would be protected against retaliation by JPL. Moore followed Cooper's advice and was told by a member of the government's GTE investigation team to report the matter to the NASA Inspector General. On December 14, 1995, Moore called the NASA Inspector General's office and stated, in the words of the NASA special agent who took the call, that he "suspected fraud at JPL." On January 6, 1996, Moore sent an e-mail to the NASA Inspector General's office that read as follows:

> [M]anagement persons at JPL were aware of the existence of an [sic] report prepared by an expert regarding damaged gears, in which the expert recommended that the gears be replaced. JPL subsequently issued a memo to the NASA representative [Brydon] in which they stated that there was "NO structural problem" without revealing the outside expert's opinion.

Later, Moore met with an individual from the NASA Inspector General's office.

Moore told Cooper that he had reported the issue to the NASA Inspector General. Cooper again told Moore that as a whistle blower, he would be protected against retaliation by JPL. At the recommendation of Cooper, Moore also reported the matter to the head of ethics at JPL, who began an internal investigation.

In January 1996, Yung proposed to Moore that he transfer from Yung's work group to another group headed by Michael Thorburn ("Thorburn"), a friend of Moore's. Under the proposed transfer, Moore would not have been allowed to take with him any of the projects he had been working on. This arrangement would have left him without long-term funding and would have disconnected him from Department of Defense, the largest customer for his specialty of large antenna mechanics. In connection with this transfer proposal, Yung told Moore that he should not have gone outside the chain of command and that he should have informed Yung before he talked to the NASA Inspector General. Yung also told Moore that he should consider the possibility that there would be downsizing at JPL, although according to Moore, the downsizing concerns were no more significant in 1995 than previously. Moore objected to the proposed transfer. Thorburn sent an e-mail to Yung's boss, Joseph Statman ("Statman"), stating that the transfer proposal sounded "like retribution" to him.

After Moore and Thorburn objected to the proposed transfer, no transfer took place.

In June of 1996, Yung did Moore's yearly evaluation. Yung told Moore that Yung was planning to eliminate Moore's "Special Projects" title and put Moore under an intermediate supervisor, Ben Saluda ("Saluda"). As a reason for the proposed reorganization, Yung told Moore that he was not a team player because he had caused an ethics investigation, and that by putting him under Saluda, Yung could improve communications and break down barriers that made Moore "an empire to himself." Yung also abruptly and angrily told Moore that Moore could not work on the NASA antenna project for two years. In the end, however, Yung did not eliminate Moore's "Special Projects" title and did not put him under Saluda. After the yearly evaluation, Moore complained to JPL's ethics office about the proposed reorganization.

JPL's ethics office eventually concluded that White and Yung had not acted fraudulently when they had stated in their memo to Allied Signal's Brydon that there was no problem with the structural integrity of the gears and no current need to replace them. JPL's ethics office further concluded that Yung had not retaliated against Moore. The ethics office, however, noted that there was a personality conflict between Yung and Moore and that Yung had not handled the situation with the expected skill.

Following the ethics report, Statman and his supervisor, Harry Detweiler ("Detweiler"), repeatedly met with Yung and Moore. Some time after these meetings, Statman drafted a "Working Agreement," whose purpose it was to "document some specific working arrangements that were discussed and agreed to by Chris Yung and Mike Moore" at their meetings. Statman noted on the first page of the draft agreement that he had "filled in" a section

on group organization because they did not have time to talk about it at the meetings. The draft agreement also invited Yung and Moore to "please review and comment" on the document. A section of the draft labeled "Communication in the Group" stressed the importance of the "line management chain" and advised that where an issue is taken to "the next level up," it should be shared "with the direct line manager first." Another section of the draft labeled "Group Organization" provided that while Moore's "Special Projects" title would "at this time" remain, its continuation would be reviewed at the end of the next year. This section further provided that Moore would report progress on the NASA antenna work through Saluda. The "Group Organization" section of the draft finally provided that "[i]f there is a need to change [Moore's] signature authority"— i.e., his ability to directly requisition items for JPL—Moore and Yung would review the need with their manager.

On September 16, 1996, at another meeting with Detweiler, Statman, and Yung, Moore for the first time was given the draft "Working Agreement." Moore found that the draft agreement was "humiliating," "patronizing," and yet another form of "reprisal," and concluded he "couldn't stand another minute of meetings with those people." He did not seek to discuss the draft but instead later that day told Statman he would be submitting a letter of resignation. Statman asked Moore if he wanted to speak "about this" to someone higher than Statman in the chain of command. Moore declined the offer and then submitted his letter of resignation.

Moore filed a complaint in the Superior Court for the State of California for the County of Los Angeles, alleging state law claims that included wrongful termination in violation of public policy. After Moore

amended the complaint in October 1998 to include federal retaliation claims under the False Claims Act and the Major Fraud Act, JPL removed the action to the United States District Court for the Central District of California. On April 25, 2000, the District Court granted JPL's motion for summary judgment on Moore's federal claims and dismissed the remaining state law claims without prejudice for lack of subject matter jurisdiction.

The District Court held that Moore had failed to show that he had engaged in activity protected under the False Claims Act. The District Court found that Moore had failed to show a direct relationship between the allegedly false statement in the memo from White and Yung to Brydon at Allied Signal that there was no problem with the structural integrity with the antenna gears and that there was no current need to replace these gears in the foreseeable future, on the one hand, and any disbursement by the Federal Government to JPL, on the other. Because of the absence of such a direct relationship, the District Court concluded that when Moore reported the allegedly false statement to the NASA Inspector General, this activity could not have possibly resulted in a False Claims Act case and the activity was, therefore, not protected.

The District Court reported that its thorough research had produced "no published case in the country which discusses the standard that is to be applied for determining whether an employer's activity rises to the level of retaliation under the False Claims Act or any similar act." The District Court proposed the following standard:

> For conduct to constitute actionable threats [of] retaliation, a fact-finder must be able to say tha[t] was *clearly unreasonable*. Naturally, repeated suggestions or clearly unreasonable sugges-

tions may amount to threats and harassment even if the suggestions are never implemented. However, mere proposals cannot amount to an actionable threat if the employer might reasonably think the proposal would be accepted.

(Emphasis added). The District Court held that JPL's actions did not rise to the level of being "clearly unreasonable." Having found that JPL did not retaliate against Moore, the District Court granted summary judgment in favor of JPL.

## II.

### A. Standard of Review

We review a grant of summary judgment *de novo. Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000) (en banc). The appellate court must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

### B. Legal Background

■ The False Claims Act was enacted "with the purpose of [combating] widespread fraud by government contractors who were submitting inflated invoices and shipping faulty goods to the government." *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1265–66 (9th Cir.1996). To this end, the False Claims Act creates liability for any person who, *inter alia*, "(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; ... (4) has possession, custody, or control of property or money used, or to be used, by the Government and, intending to defraud the

Government or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt; ... or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government...." 31 U.S.C. § 3729(a).

■■■ The False Claims Act protects "whistle blowers" from retaliation by their employers. Thus, the False Claims Act makes it illegal for an employer to "discharge[], demote[], suspend[], threaten[], harass[], or in any other manner discriminate[] against [an employee] in the terms and conditions of employment ... because of lawful acts done by the employee ... in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section ...." 31 U.S.C. § 3730(h). An employee must prove three elements in a § 3730(h) retaliation claim: (1) that the employee engaged in activity protected under the statute; (2) that the employer knew that the employee engaged in protected activity; and (3) that the employer discriminated against the employee because she engaged in protected activity. *Hopper*, 91 F.3d at 1269.

Similarly, the Major Fraud Act creates liability for "[w]hoever knowingly executes, or attempts to execute, any scheme or artifice with the intent—(1) to defraud the United States; or (2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises, in any procurement of property or services as a prime contractor with the United States or as a subcontractor or supplier on a contract in which there is a prime contract with the United States...." 18 U.S.C. § 1031(a). The Major Fraud Act contains an anti-retaliation provision that is identical to that of the False Claims Act for all purposes relevant to this case. *See* 18 U.S.C. § 1031(h).

## III.

**A. There is a genuine issue of material fact whether Moore engaged in protected activity when he reported to the NASA Inspector General that he suspected fraud at JPL.**

■■■ We have held that to come under the protection of the anti-retaliation provision of the False Claims Act, "[s]pecific awareness of the FCA is not required," but "the plaintiff must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action." *Hopper*, 91 F.3d at 1269. We reaffirm this standard today and clarify that an employee engages in protected activity where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government.[1] *See also LeVine v. Weis*, 90 Cal.App.4th 201, 209–10, 108 Cal.Rptr.2d 562 (2001) (under the retalia-

---

1. This standard, which has both a subjective and an objective prong, comports with our interpretation of the anti-retaliation provision of Title VII. *See Trent v. Valley Elec. Ass'n*, 41 F.3d 524, 526 (9th Cir.1994) (quoting Barbara Lindemann & David D. Kadue, *Sexual Harassment in Employment Law* 280 (1992), for the proposition that "[t]he EEOC and most courts have stated that [Title VII's anti-retaliation provision, 42 U.S.C. § 2000e–3(a),] protects opposition[to an employment prac-

tice] so long as the employee has a reasonable and good-faith belief that the practice opposed constituted a violation of Title VII") (last alteration in original). The Supreme Court recently found "no occasion to rule on the propriety of this interpretation," which remains the law in this circuit. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 121 S.Ct. 1508, 1509, 149 L.Ed.2d 509 (2001).

tion provision of the False Claims Act, "[p]laintiff . . . need only show that he had reasonably based suspicions of a false claim").

The District Court concluded that because Moore had failed to show that the memo from White and Yung to Brydon was "directly related" to any government payment, Moore's whistle blowing could not have possibly resulted in a False Claims Act case. The District Court therefore held that Moore did not engage in protected activity. As shown below, Moore's activity met the standard for protected activity.

The False Claims Act is aimed at fraud by government contractors. *See Hopper,* 91 F.3d at 1265. Moore called the NASA Inspector General's office and stated, in the words of the NASA special agent who took the call, that he "suspected fraud at JPL," a government contractor. Moore and McVittie had recommended *replacing* the antenna gears. Yung had approved a lien on the transfer of the antenna which also indicated that the gears needed to be replaced. Shortly thereafter, an internal JPL memo stressed the importance of prompt delivery to make a good impression on NASA. JPL's contract with NASA covering, among other projects, the antenna project provided for a fixed Base Allowance of $6,000,000 and a discretionary Incentive Award of up to $12,000,000. On the same day on which JPL circulated the internal memo, White and Yung sent Brydon at Allied Signal, the outside contractor responsible for releasing the lien, a memo stating that there was no problem with the structural integrity of the gears and no need to replace them in the foreseeable future. When Brydon asked for McVittie's report, JPL sent him the report but omitted the pages on which McVittie recommended replacing the gears.

■ Based on this evidence, a reasonable jury could conclude that Moore believed in good faith that White and Yung had lied to Brydon to speed up the release of the lien on the antenna and ensure delivery of the antenna to NASA as scheduled, and, as a result, increase the amount of the discretionary Incentive Award NASA would pay to JPL. Thus, under the first prong of our test, a reasonable jury could conclude that Moore believed in good faith that JPL was attempting to defraud the government in violation of the False Claims Act.

Moreover, based on this evidence, a reasonable jury could also conclude that a reasonable employee in the same or similar circumstances might believe, as Moore actually did, that White and Yung lied to Brydon for the purpose of increasing the amount of the discretionary Incentive Award NASA would pay to JPL. Thus, under the second prong of our test, a reasonable jury could conclude that a reasonable employee in the same or similar circumstances might believe that JPL was attempting to defraud the government in violation of the False Claims Act.

■ Contrary to the District Court's conclusion, the allegedly false statement in the memo from White and Yung to Brydon was, therefore, "directly related" to a government payment, and Moore's whistle blowing could have possibly resulted in a False Claims Act case. Moore thus engaged in activity that was protected under the anti-retaliation provision of the False Claims Act. For the same reasons, Moore also engaged in activity that was protected under the virtually identical anti-retaliation provision of the Major Fraud Act.

**B. There is a genuine issue of material fact whether JPL knew that Moore engaged in the protected activity of investigating fraud.**

■ An employee is entitled to whistle blower protection only if "the employer

is aware that the employee is investigating fraud...." *Hopper*, 91 F.3d at 1269. At the recommendation of JPL's in-house attorney Cooper, Moore reported his concerns to the head of ethics at JPL, who began an internal investigation "to look into the possibility of fraud." Cooper knew that Moore had talked to the NASA Inspector General about his concerns. Cooper twice told Moore that he would be protected against retaliation by JPL because he was a whistle blower. Yung and others in the "line management chain" also knew that Moore had talked to the NASA Inspector General. For example, Yung told Moore that he should not have gone outside the chain of command and that he should have informed Yung before he talked to the NASA Inspector General. On the basis of this evidence, a reasonable jury could conclude that JPL knew that Moore engaged in the protected activity of investigating fraud.

**C. There is a genuine issue of material fact whether JPL discriminated against Moore because he engaged in protected activity when it proposed to transfer him without his work, eliminate his job title, and put him under an intermediate supervisor.**

The False Claims Act and Major Fraud Act anti-retaliation provisions protect employees against "discharge[ ]," "threat[s]," "harass[ment]," and any other ... "discriminat[ion]." 31 U.S.C. § 3730(h); 18 U.S.C. § 1031(h). The District Court correctly concluded that JPL's actions did not amount to a constructive discharge. "[A] reasonable person in [Moore's] position would [not] have felt that he was forced to quit because of intolerable and discriminatory working conditions." *Huskey v. City of San Jose*, 204 F.3d 893, 900 (9th Cir.2000). The District Court, however, incorrectly concluded that JPL's actions also did not amount to threats or harassment that might be actionable under the False Claims Act and the Major Fraud Act.

The District Court adopted a "clear unreasonableness" standard for threats and harassment, whereby "repeated suggestions or clearly unreasonable suggestions may amount to threats and harassment even if the suggestions are never implemented." The District Court evaluated unreasonableness from the point of view of the employer when it held that "mere proposals cannot amount to an actionable threat if the employer might reasonably think the proposals would be accepted."

JPL suggested before the District Court that behavior does not constitute retaliation under the False Claims Act or the Major Fraud Act unless it would be sufficient to constitute an adverse employment action under Title VII. In discussing Title VII's anti-retaliation provision, we recently adopted a simple "reasonableness" standard for adverse employment actions that evaluates reasonableness from the point of view of the employee. *See Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000). We held:

> [Title VII's anti-retaliation] provision does not limit what type of discrimination is covered, nor does it prescribe a minimum level of severity for actionable discrimination....
>
> ... [We] hold that an action is cognizable as an adverse employment action if it is *reasonably likely to deter employees from engaging in protected activity*.

*Id.* at 1243 (emphasis added). We stressed that to be considered an adverse employment action, the action did not have to "materially affect the terms and conditions of employment ...." *Id.* at 1242.

We adopt JPL's suggestion that behavior does not constitute retaliation un-

der the False Claims Act or the Major Fraud Act unless it would be sufficient to constitute an adverse employment action under Title VII. Accordingly, we hold that an action may be cognizable as discrimination under the False Claims Act or the Major Fraud Act if it is reasonably likely to deter employees from engaging in activity protected under either of these statutes. *See Ray*, 217 F.3d at 1243.

 Considering JPL's actions as a whole, a reasonable jury could conclude that these actions were reasonably likely to deter employees from engaging in activity protected under the False Claims Act and the Major Fraud Act. Yung proposed to transfer Moore without his taking with him the projects he had been working on, or other long-term funding, and also told Moore he should be concerned about downsizing. Yung also told Moore that Yung was planning to eliminate Moore's job title and put him under an intermediate supervisor. Yung further told Moore he could not work for two years on the project about which Moore had talked to the NASA Inspector General. Moreover, Statman drafted a "Working Agreement" which suggested Moore's job title and signature authority would be subject to review and which again provided that Moore would report to an intermediate supervisor.

JPL undertook these actions against the backdrop of Yung complaining that Moore should not have gone outside the chain of command when he talked to the NASA Inspector General. Similarly, the "Working Agreement" advised Yung to talk to the "direct line manager" before he took an issue "to the next level up." Such a rule would defeat the purpose of the whistle blower statutes and contradict JPL's normal "open door" policy.

Employees were "reasonably likely" to believe that JPL took these actions because Moore had talked to the NASA Inspector General. It is true that neither Yung's proposals nor Statman's "Working Agreement" were implemented. But the prospect of having continually to defend his right to his work, funding, job title, reporting status, and signature authority was by itself reasonably likely to deter an employee from reporting suspected fraud. Therefore, JPL's actions concerning Moore are cognizable as discrimination under the False Claims Act and the Major Fraud Act.

We conclude that there is a genuine issue of material fact as to whether JPL discriminated against Moore because of protected activity. As Moore has presented evidence from which a reasonable jury could conclude that JPL did discriminate against him because of such activity, the District Court erred in granting summary judgment.

## CONCLUSION

Moore has presented evidence from which a reasonable jury could conclude that he engaged in activity that is protected under the False Claims Act and the Major Fraud Act, that JPL knew that he engaged in protected activity, and that JPL discriminated against him because he engaged in protected activity. Accordingly, we REVERSE the District Court's grant of summary judgment in favor of JPL and REMAND the case to the District Court for further proceedings consistent with this opinion.