# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 02-1332/02-1471

_____

| | | |
|---|---|---|
| Randolph Wilkins, | * | |
| | * | |
| Appellee/Cross-Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| St. Louis Housing Authority, | * | |
| | * | |
| Appellant/Cross-Appellee. | * | |

_____

Submitted:  November 7, 2002

Filed:  December 31, 2002

_____

Before RILEY, BEAM, and SMITH, Circuit Judges.

_____

BEAM, Circuit Judge.

In this action arising under the whistleblower protection provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h), the St. Louis Housing Authority ("SLHA") appeals from the district court's[1] submission to the jury of a special verdict form and from its denial of SLHA's motions for judgment as a matter of law. Randolph

_____

[1]The Honorable David D. Noce, United States Magistrate Judge for the Eastern District of Missouri.  The parties consented to trial before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), with direct review to this court.

Wilkins cross-appeals from the district court's calculation of double back-pay damages under the statute. We affirm.

## I.    BACKGROUND

SLHA is a municipal corporation created by the City of St. Louis to administer and operate its public housing developments. SLHA receives funding from the United States Department of Housing and Urban Development ("HUD") pursuant to an annual contributions contract. In 1992, HUD established the Public Housing Management Assessment Program ("PHMAP") in an effort to standardize and objectively measure the management performance of public housing agencies that it funds. As part of that program, SLHA is required to submit annual performance certifications and suggested scores in eight categories or "indicators." 24 C.F.R. §§ 901.10 to 901.45. HUD then combines these certifications and suggestions with its own data and, after confirmatory review, assigns final grades for each indicator and an overall percentage score for the reporting period. Agencies with scores of 90% or better are designated "high performers"; those with scores from 60% to 89% are designated "standard"; and agencies with scores below 60% are designated "troubled." 24 C.F.R. § 901.115.

Wilkins joined SLHA in 1996 as a Quality Control Evaluator for Public Safety. He was responsible for evaluating the performance of public safety officers and other aspects of SLHA's security division. While working in that capacity Wilkins became concerned about, and eventually reported to HUD, various deficiencies in SLHA's security operations and the misreporting of those deficiencies. HUD subsequently hired Quadel, an outside agency, to evaluate SLHA. Based on Quadel's report and on a failing PHMAP score of 18.5%[2] for fiscal year 1997, HUD designated SLHA a

_____

[2]HUD assigned a final PHMAP score of 18.5% after a confirmatory review of SLHA's own PHMAP report revealed discrepancies between SLHA's reported score

"troubled" agency in March 1998. Consequently, HUD assigned a Troubled Agency Recovery Center ("TARC") team to help SLHA improve its performance and required SLHA to enter into a formal agreement governing strategies for improvement.[3]

Shortly thereafter, Wilkins was promoted[4] to Manager of Security Operations and given primary responsibility for tracking and reporting SLHA's performance in all four components of Indicator 8,[5] the PHMAP category for security. He continued to report SLHA's noncompliance with HUD security regulations, both to his supervisors within SLHA and directly to members of the TARC team, and to express concerns that PHMAP scores would be falsely reported. As Wilkins's communications increased and the time for 1998 PHMAP reporting drew near, Wilkins was first temporarily reassigned from SLHA's main office to a satellite location, and then suspended for two weeks without pay.[6] During that time, SLHA

of 48.83% and its actual performance.

[3]According to 24 C.F.R. § 901.200, failure to comply with the agreement or to improve its PHMAP score by at least ten points within one year would put SLHA into "substantial default." At that point, HUD would have the discretion to (1) take control of the agency, (2) transfer control to an alternative management entity, or (3) discontinue funding and appoint a receiver to take control of the agency. 24 C.F.R. §§ 901.210, 901.215, 901.230.

[4]He also received a $5,000 annual pay increase.

[5]Indicator 8 includes the following components: (1) tracking and reporting crime-related problems; (2) screening applicants with history of criminal and/or drug-related activity; (3) enforcing lease provisions related to criminal and/or drug-related activity; and (4) reaching goals in crime- and drug-prevention programs. 24 C.F.R. § 901.45.

[6]Officially, the suspension resulted from Wilkins's failure to report an incident at one of SLHA's housing complexes. However, Wilkins filed a grievance over the suspension, alleging that the real reason for the suspension was to remove Wilkins from the PHMAP reporting process because of his unwillingness to report inflated

compiled and reported PHMAP data for 1998, certifying a suggested overall score of 37.1%, which reflected an improvement from the previous year of almost twenty percentage points.

Wilkins returned to work in December 1998 and was told to report directly to SLHA Executive Director Thomas Costello. He resumed his efforts to expose what he believed to be fraudulent PHMAP reporting practices, informing TARC team-member Tom Atzmiller that the 1998 scores were inaccurate. Atzmiller wrote to Costello and expressed concern over SLHA's compliance with security regulations. And once again, HUD's confirmatory review of SLHA's report resulted in a corrected PHMAP score of 14.25%, less than half the reported score of 37.1%, and well below the corrected score for 1997, 18.5%. Not only had SLHA failed to improve by the ten points required under 24 C.F.R. § 901.200, its performance had declined.

In January 1999, Wilkins's title was changed to Security Monitor/Coordinator, but he retained responsibility for monitoring and reporting on various components of the PHMAP report. In June 1999, Cheryl Lovell replaced Costello as SLHA Executive Director. She met with all SLHA personnel in July 1999 to discuss large-scale workforce reduction plans, which included plans to privatize security operations by October 1999. As a result, Wilkins lost administrative oversight of SLHA security officers, and instead monitored security performance through the reports of private security contractors. He continued to complain to his supervisors about security problems and the private contractors' noncompliance with reporting requirements, and he again informed HUD personnel that SLHA's reported PHMAP scores for fiscal year 1999 were incorrect. He intensified his efforts in November and December 1999, sending letters to HUD and to his SLHA supervisors that described breakdowns in crime-reporting processes and fraudulent PHMAP reporting practices. Finally, after Wilkins's numerous attempts to expose SLHA's failing performance and false

scores. The suspension was subsequently reversed.

-4-

reporting with respect to tracking and reporting crime, screening of potentially dangerous applicants, enforcement of HUD lease provisions relating to crime and drug-related activity, particularized security risks in elderly living facilities, and unsafe security conditions generally, SLHA fired Wilkins on December 31, 1999.

At the time of his termination, Wilkins was fifty-one years old and earning an annual salary of $39,000. He began seeking related employment, but did not apply with any of the private contractors who had taken over security for SLHA because he considered the pay inadequate. In October 2000, he was hired by the United States Department of Defense in a security position with an annual salary of $40,000. On June 28, 2001, Wilkins was terminated from this position as well. He earned approximately $30,000 during his nine months of work for the department. Since his termination, Wilkins has sought employment in security and law enforcement, but only with federal executive branch agencies in the St. Louis area. He has been unable to find a suitable position.

On May 12, 2000, before Wilkins began working for the Department of Defense, he filed this action in the district court. He alleged that SLHA violated the whistleblower protection provision of the FCA when it terminated him in retaliation for his statements to HUD concerning SLHA's security deficiencies and PHMAP reporting practices. The case was tried before a jury, which found, via special verdict form, that SLHA terminated Wilkins as a direct result of his statements to SLHA and HUD personnel, and that Wilkins suffered $79,170 in lost wages. The district court after discounting Wilkins' mitigating income, awarded statutorily-authorized double back-pay damages in the amount of $98,340. The court also awarded front pay in the amount of $10,000.[7] Finally, the court denied SLHA's motions for judgment as a

---

[7]Wilkins originally sought $198,667 in front pay, arguing that he would have worked at SLHA until retirement at age 65, that he would have required ten months to find a full-time job, that it would be an entry-level job at $30,000 per year, and that his annual wage-and-benefits loss until retirement would be $14,000 per year. The

matter of law. SLHA appeals from the special verdict form and from the denial of its motions. Wilkins cross-appeals from the calculation of back-pay damages.

## II.    DISCUSSION

This appeal raises two basic issues: whether there was sufficient evidence that Wilkins's conduct amounted to protected activity under the anti-retaliation provision of the FCA, and whether, in the instant case, the statute required the district court to double the back-pay damages before or after subtracting Wilkins's interim earnings. Before we reach those substantive issues, however, we must consider the extent of our jurisdiction under the statute.

### A.    Jurisdiction Under 31 U.S.C. § 3730(h)

The anti-retaliation provision of the FCA provides a cause of action in federal district court for employees who are "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her *employer* because of lawful acts done by the employee . . . in furtherance of a [civil action for false claims]." 31 U.S.C. § 3730(h) (emphasis added). Because our jurisdiction is limited to actions between employees and employers, we must decide whether a municipal corporation like SLHA is an "employer" who can be sued under the statute.

The Supreme Court held in <u>Vermont Agency of Natural Resources v. United States ex rel. Stevens</u>, 529 U.S. 765, 787 (2000), that a state cannot be a "person" subject to suit under the qui tam provision of the FCA, 31 U.S.C. § 3729. The court premised its holding on two basic presumptions. First, it noted the "longstanding

_____

district court, however, rejected most of these arguments, finding that Wilkins had failed to mitigate his lost-future-income damages.

-6-

interpretive presumption that 'person' does not include the sovereign." Id. at 780. Second, it found that, because the treble-damages component of the qui tam statute is "essentially punitive in nature," state liability would be inconsistent with the "presumption against imposition of punitive damages on governmental entities."[8] Id. at 784-85. The Court reasoned that, since Congress has failed to overcome these presumptions by expressing a clear intent to subject states to liability, states are not persons under the statute. Id. at 787.

Stevens has given rise to much litigation and divided authority in the lower courts over its application to local governments and municipal entities like SLHA. Some of our sister circuits have extended Stevens "immunity" to local governments in the qui tam context. See United States ex rel. Dunleavy v. County of Delaware, 279 F.3d 219, 225 (3d Cir. 2002) (holding that "Congress did not intend to disturb local governmental immunity from punitive damages under the FCA by clearly including local governments within the meaning of the term 'person'"); United States ex rel. Garibaldi v. Orleans Parish Sch. Bd., 244 F.3d 486, 493 (5th Cir. 2001) (holding that "the punitive damages regime of the False Claims Act . . . reflects a congressional intent that the term 'person' in the liability provisions of the [act] not include local governments"). Other courts have held that Stevens does not apply to local governments. United States ex rel. Chandler v. Cook County, 277 F.3d 969, 980, 981 (7th Cir. 2002) (finding that Stevens's presumptions "cut[] the other way for municipalities" and holding that counties are amenable to suit under the qui tam provision); United States ex rel. Rosales v. San Francisco Hous. Auth., 173 F. Supp. 2d 987, 1015 (N.D. Cal. 2001) (holding that a municipal housing authority "is a statutory 'person' subject to private lawsuit under the FCA"). But none of these courts addressed the question before us in this appeal: whether Stevens requires a finding

---

[8]On this point, the Court acknowledged a critical distinction between the punitive nature of treble damages and the compensatory nature of double damages. Stevens, 529 U.S. at 785-86.

that local governments cannot be sued as "employers" under the FCA's anti-retaliation statute.

One federal district court has, however, squarely addressed this question, and we are persuaded by its reasoning. In United States ex rel. Satalich v. Los Angeles, 160 F. Supp. 2d 1092 (C.D. Cal. 2001), the court held that Stevens bars qui tam suits against municipalities because of the punitive nature of the mandatory treble damages. Id. at 1102-07. But it went on to state that "retaliation claims under section 3730(h) are not dependent on a relator's ability to succeed on, or even file, a cause of action under section 3729." Id. at 1108. And it noted the distinction, recognized by the Stevens Court, between treble damages and double damages, agreeing that the double back-pay damages in the anti-retaliation provision are compensatory rather than punitive. Id. at 1109. Thus, the court concluded that "employer" in the retaliation context should logically be read more broadly than "person" in the qui tam context and held that a municipality is an "employer" under section 3730(h). See id. at 1110.

While we need not decide whether SLHA is a "person" for purposes of the qui tam provision, we agree with the Satalich court's view of the anti-retaliation provision, and this view is supported by the statute's legislative history: "As is the rule under other Federal whistleblower statutes as well as discrimination laws, the definitions of 'employee' and 'employer' should be all-inclusive. . . . Additionally, 'employers' should include public as well as private sector entities." S. Rep. No. 99-345, at 34-35 (1986), reprinted in 1986 U.S.C.C.A.N. 5299-5300. We find that SLHA is an "employer" subject to suit under section 3730(h). The case is, therefore, properly before us on appeal.

## B.    Protected Activity

We turn now to the merits.  SLHA advances two main arguments: first, that the trial court erred by omitting the essential element of protected activity from the special verdict form it submitted to the jury; and second, that Wilkins failed to present sufficient evidence that he engaged in protected activity under section 3730(h).[9]  The submission and form of interrogatories to the jury are matters within the sound discretion of the trial court, and we review only for abuse of discretion.  E. I. du Pont de Nemours & Co. v. Berkley and Co., Inc., 620 F.2d 1247, 1271 (8th Cir. 1980).  We review de novo the district court's denial of a motion for judgment as a matter of law and view the facts in the light most favorable to the nonmoving party.  Mattis v. Carlon Elec. Prods., 295 F.3d 856, 860 (8th Cir. 2002) (citing Cardenas v. AT & T Corp., 245 F.3d 994, 998 (8th Cir. 2001)).  Judgment as a matter of law is only appropriate when no reasonable jury could have found for the nonmoving party.  Id.

The FCA whistleblower statute protects employees who are "discharged . . . because of lawful acts done by the employee . . . in furtherance of [a civil action for false claims]."  31 U.S.C. § 3730(h).  The district court held that, in order to prove retaliation under this section, a plaintiff must establish that (1) the plaintiff was

---

[9]Although Wilkins also disputes the merits of these contentions, he argues, primarily, that SLHA has failed to preserve the issues for appellate review.  We disagree.  We are satisfied that SLHA objected to the special verdict form with adequate specificity and that the alternative verdict director it submitted before trial was sufficient to preserve the issue under our cases.  See Morse v. S. Union Co., 174 F.3d 917, 926 (8th Cir. 1999).  We also find that SLHA preserved the issue of whether Wilkins presented sufficient evidence of protected activity.  It argued the issue as part of its oral motion for judgment as a matter of law at the close of the evidence, and its renewed motion incorporated the argument by reference.  Although SLHA could certainly have been more thorough in its compliance with Rules 50 and 51 of the Federal Rules of Civil Procedure, its deficiencies do not rise to the level of waiver.

engaged in conduct protected by the FCA; (2) the plaintiff's employer knew that the plaintiff engaged in the protected activity; (3) the employer retaliated against the plaintiff; and (4) the retaliation was motivated solely by the plaintiff's protected activity. Wilkins v. St. Louis Hous. Auth., 198 F. Supp. 2d 1080, 1086 (E.D. Mo. 2001) (citing Norbeck v. Basin Elec. Power Coop., 215 F.3d 848, 851 (8th Cir. 2000)). This was a correct statement of the law.

Thus, the question is: what qualifies as "protected activity" in the whistleblower context? SLHA argues that falsely reported PHMAP scores do not constitute a "claim" as defined by the qui tam statute because they could not, as failing scores, have resulted in any economic loss to the government. See 31 U.S.C. § 3729(c). Thus, SLHA argues, Wilkins's attempts to expose those reports were not done in furtherance of a qui tam action. This argument misses the distinction between the standards for a successful qui tam suit and those for an anti-retaliation claim. Under the whistleblower statute, "an employee engages in protected activity where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." Moore v. Cal. Inst. of Tech. Jet Propulsion Lab., 275 F.3d 838, 845 (9th Cir. 2002). In adopting that standard, the Moore court drew upon its interpretation of Title VII's anti-retaliation provision. See id. at 845 n. 1 (citing Trent v. Valley Elec. Ass'n, 41 F.3d 524, 526 (9th Cir. 1994)). Along with the Fifth, Seventh, and Ninth Circuits, we have also employed a reasonable-belief standard in the Title VII context. See Sisco v. J.S. Alberici Constr. Co., 655 F.2d 146, 150 (8th Cir. 1981) ("[A]s long as the employee had a reasonable belief . . . the claim of retaliation does not hinge upon a showing that the employer was in fact in violation of Title VII."); see also Trent, 41 F.3d at 526 (citing similar cases from other circuits).

We think the Moore reasonableness test is the appropriate standard for determining whether an employee engaged in protected activity under section 3730(h). Thus, we must determine whether Wilkins had both a good-faith and an

objectively reasonable belief that SLHA was committing fraud against the government. We are persuaded by evidence in the record that Wilkins had both.

Congress passed, and President Lincoln signed, the False Claims Act of 1863 to combat the "massive frauds" committed by government contractors against the Union Army during the Civil War. United States v. Bornstein, 423 U.S. 303, 309 (1976). Congressional hearings at the time revealed instances of the same horses being sold twice to the army, sand being substituted for gunpowder, and crates full of sawdust being shipped to the front lines labeled as muskets. See 144 Cong. Rec. S7675-76 (daily ed. July 8, 1998) (statement of Sen. Grassley). Viewed in the light most favorable to Wilkins, there is sufficient evidence in this case of Wilkins's belief that SLHA, like the Civil-War contractors, was, in essence, shipping crates full of sawdust (*i.e.*, unsafe public housing) for which the government had paid full price (*i.e.*, an annual contract contribution for a housing environment that was safe). We agree with SLHA that Wilkins could not reasonably have believed that falsely reported PHMAP scores would somehow induce the government to spend *more* money than it was already spending under its annual contributions contract. But fraudulently concealing "defective goods" is also a false "claim" for payment within the purview of the FCA, and Wilkins reasonably believed he was acting to prevent, or at least report, such concealment. Because we find sufficient evidence that Wilkins engaged in protected activity under section 3730(h), we affirm the district court's denial of SLHA's motions for judgment as a matter of law.

Thus, SLHA's argument that the special verdict form erroneously omitted the essential element of protected activity is without merit. The district court simply bifurcated the issue of protected activity, submitting the factual component of the issue to the jury via special verdict form, and reserving the legal determination for itself. Accordingly, the jury found that Wilkins engaged in specific conduct, and the judge determined that such conduct amounted to protected activity. While the court

could have been more precise in wording the special verdict form and in articulating the grounds for its legal determination, we find no abuse of discretion.

## C.     Double Back-Pay Damages

Finally, we address the issue raised by Wilkins in his cross-appeal from the calculation of damages. He argues that the district court erred by subtracting his interim earnings from the back-pay damages before doubling them.[10] The statute, for its part, is silent on the issue of mitigation, providing only for "2 times the amount of back pay." 31 U.S.C. § 3730(h).

We considered this issue, albeit in a different factual context, in Hammond v. Northland Counseling Center, Inc., 218 F.3d 886 (8th Cir. 2000). The plaintiff in that case had, after her termination, secured alternate employment with compensation equal to or greater than her position with the defendant, including retroactive pay from the date of her termination. Id. at 890. We held that doubling back-pay damages before subtracting mitigating income would have resulted in a windfall to a plaintiff who sustained no actual damages. Id. at 892. Although Wilkins, having sustained nearly $80,000 in actual damages, certainly stands in a different position than the plaintiff in Hammond, we think Hammond's underlying policy of preventing a windfall to whistleblower plaintiffs applies to this case with equal force. The statute clearly expresses an intent to grant "all relief necessary to make the employee whole." 31 U.S.C. § 3730(h). We feel confident that an award of nearly $100,000 completely compensates Wilkins for the $80,000, offset by $30,000 in mitigating income, that he lost as a result of his retaliatory termination. The district court

---

[10]The court subtracted Wilkins's income while employed with the Department of Defense ($30,000) from the lost wages he suffered as a result of SLHA's retaliatory termination ($79,170), then multiplied the difference by two (($79,170 - $30,000) x 2), for a total award of $98,340.

properly doubled Wilkins's back-pay damages *after* subtracting his interim earnings.

## III.   CONCLUSION

We affirm the district court in all respects.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.