Honorable Diane J. Humetewa, United States District Judge
Plaintiff Lori Josey ("Plaintiff") brought this matter against Defendants Impulse Dynamics (USA), Inc. ("Impulse"), and Insperity PEO Services, L.P. ("Insperity") (collectively, "Defendants") raising a single claim of retaliation in violation of the federal False Claims Act ("FCA").[1] Now before the Court is Defendants' Motion to Dismiss ("Mot.") (Doc. 9), to which Plaintiff has filed an Opposition ("Opp'n") (Doc. 11) and Defendants have filed a Reply (Doc. 12).[2]
I. BACKGROUND
This case concerns reports of alleged irregularities during clinical testing of the Optimizer, an investigational medical device used to treat chronic heart failure. Impulse, the Optimizer's developer, remains in the final stages of the FDA approval process. (Doc. 1, Compl. ¶¶ 3, 8.) Insperity is Impulse's human resources provider. (¶ 4.) Clinical testing of the Optimizer in the United States began in 2005, with the FIX-HF-5 study. (¶ 9.) When FIX-HF-5 failed to reach its primary efficacy endpoint, Impulse designed and sponsored a second study, FIX-HF-5C, to prospectively confirm its results. (¶¶ 9-12.) FIX-HF-5C's development included the submission of protocols to the FDA. (¶ 13.) The FDA approved, and Impulse affirmed that it would conduct the trial in accordance with those protocols. (Id. ) Among other things, the protocols prohibited Impulse employees from directly recruiting or administering testing to study participants. (¶ 14.) The protocols also included a metric, known as the Minnesota Living with Heart Failure Questionnaire ("MLHFQ"), used to measure the Optimizer's effect on quality of life. (¶¶ 15-16.)
On January 1, 2016, Plaintiff began working for Defendants as a Senior Field Clinical Engineer. (¶ 20.) One of Plaintiff's duties included the removal of barriers impeding site enrollments for FIX-HF-5C. (¶ 21.) This involved advocating for potential subject recruitment at clinical sites and helping to increase randomization of subjects for trial participation. (Id. ) Plaintiff trained site investigators and coordinators on the study protocols, provided case support for site surgeons and staff during implants, and followed up with subjects. (¶ 23.)
*606 Plaintiff's retaliation claim concerns an incident at a clinical site in Mesa, Arizona. On August 9, Plaintiff witnessed another clinical engineer, Jason Kindler, verbally administer the MLHFQ to a subject and record the subject's responses. (¶ 26.) The protocols provided that a clinical site coordinator would administer the test, with the subject writing his or her answers on the questionnaire. (¶ 27.) Concerned that administration of the MLHFQ by an Impulse employee might skew test results, Plaintiff reported it to her supervisor, Anthony Caforio, who had also witnessed the incident. (¶¶ 28-29.) After Plaintiff said this "was not right," Kindler observed, "You do what you have to do to get patients randomized." (¶ 29.) Caforio did not respond. (Id. )
Plaintiff later learned that a site coordinator had also complained to Angela Stagg, Implulse's Clinical Manager, about Kindler. (¶ 30.) The site coordinator claimed that Kindler had pressured her to rush subjects through testing to get subjects randomized more quickly. (Id. )
Plaintiff believes she was subject to increased scrutiny and criticism for reasons unrelated to her job performance after she reported Kindler. (See ¶¶ 34-44.) On September 28, Caforio sent an email to Plaintiff placing her on a 30-day disciplinary notice period stating that failure to improve would lead to further disciplinary action or termination. (¶ 40.) The notice cited Plaintiff for insubordination related to expense reports, failure to split a $ 1,500 client dinner bill with Kindler, and unprofessional comments and behavior during that dinner. (¶ 40.) Copying members of upper management, Plaintiff responded with an email to Cafario disputing the underlying allegations. (¶ 42.)
Plaintiff then elevated her concerns to upper management at Impulse. On September 29, Plaintiff called Vice President of Human Resources Nitsan Mor. She reported that Caforio and Kindler had failed to follow applicable protocols at the Mesa site and that Caforio had since retaliated against her for reporting the issue. (¶ 45.) They also discussed the details of the 30-day warning. (Id. ) She raised the same issues in a discussion with Vice President of Clinical Operations Norbert Clemens on October 4. (See ¶ 46.) Clemens told Plaintiff they would discuss the issue further in person. (¶ 47.) On October 12, Plaintiff sent another email to Clemens, Mor, and Chief Executive Officer Simos Kedikoglou describing her concerns about Kindler and Caforio's protocol violations and reiterating her belief that Caforio was retaliating against her for reporting them. (¶¶ 48-49.) Plaintiff reported these concerns because she believed Impulse would submit unreliable data to the FDA for approval of the Optimizer. (¶ 50.) Clemens responded on October 19, stating that Impulse took her complaints seriously and would handle them with care. (¶ 51.)
Insperity Human Resources Specialist Erin Lau followed up with Plaintiff on November 9. In a phone call, Plaintiff and Lau discussed the conduct witnessed August 9, her immediate complaint to Caforio, her concerns about the impact of Kindler's conduct, and the alleged retaliation she experienced thereafter. (¶ 52.) The following day, Plaintiff met with Clemens and an outside auditor hired by Impulse to ensure all FDA-required paperwork was complete. (¶ 54.) During their conversation, Clemens suggested that Plaintiff's concerns were "made up." (Id. ) Clemens also concluded that the allegations underlying Caforio's 30-day warning were unfounded. (¶ 56.) Plaintiff is unaware of the extent of the auditor's investigation, though she questions its sufficiency. (See ¶¶ 57-60.)
Plaintiff was terminated on December 9. In a phone call, Caforio and Mor told Plaintiff she was being terminated in part *607 for reporting false accusations about Caforio and Kindler. (¶ 63.) A termination letter dated December 12 and signed by Lau reiterated that a reason for termination included "[f]alse reporting of serious accusations" against Caforio and Kindler. (¶ 64.) On February 22, 2018, Plaintiff filed this matter alleging that Defendants violated the FCA's anti-retaliation provision. (See generally Compl.) Defendants now seek dismissal.
II. DISCUSSION
Defendants' motion focuses on a single issue-namely, whether Plaintiff's reports about protocol violations constitute protected activity under the FCA. Defendants think not. Defendants argue that (1) to the extent Plaintiff alleges Defendants' protocol violations run afoul of FDA regulations, Plaintiff's failure to specify a regulation is fatal to her claim; and (2) more fundamentally, Plaintiff has not shown that her complaints relate to conduct one might reasonably consider an FCA violation. The Court disagrees.
A. Legal Standard for Rule 12(b)(6) Motions
A motion to dismiss pursuant to Rule 12(b)(6) challenges the legal sufficiency of a complaint. Cook v. Brewer , 637 F.3d 1002, 1004 (9th Cir. 2011). Complaints must contain a "short and plain statement showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). This requires "more than an unadorned, the-defendant-unlawfully-harmed me accusation." Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing Bell Atl. Corp. v. Twombly , 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." Twombly , 550 U.S. at 570, 127 S.Ct. 1955. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Iqbal , 556 U.S. at 678, 129 S.Ct. 1937 (citing Twombly , 550 U.S. at 556, 127 S.Ct. 1955 ) (internal quotation marks and citation omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that defendant has acted unlawfully." Id. (citation omitted).
The Court must interpret facts alleged in the complaint in the light most favorable to the plaintiff, while also accepting all well-pleaded factual allegations as true. Shwarz v. United States , 234 F.3d 428, 435 (9th Cir. 2000). But that does not include legal conclusions. Iqbal , 556 U.S. at 678, 129 S.Ct. 1937. A complaint that provides "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Twombly , 550 U.S. at 555, 127 S.Ct. 1955. Nor will a complaint suffice if it presents nothing more than "naked assertions" without "further factual enhancement." Id. at 557, 127 S.Ct. 1955.
B. Retaliation Under § 3730(h) of the False Claims Act
"Congress added 31 U.S.C. § 3730(h) to the FCA in 1986 to protect 'whistleblowers,' those who come forward with evidence their employer is defrauding the government, from retaliation by their employer." United States ex rel. Hopper v. Anton , 91 F.3d 1261, 1269 (9th Cir. 1996). The statute protects an employee who is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment" for acts "in furtherance of" an FCA claim or "other efforts to stop" fraud against the government. 31 U.S.C. § 3730(h)(1). To state a retaliation claim, a plaintiff must show that (1) she engaged in protected activity (2)
*608 about which her employer was aware and (3) for which the employer retaliated.[3] United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc. , 637 F.3d 1047, 1055 (9th Cir. 2011). This motion concerns only the first element.
"An employee engages in a protected activity by 'investigating matters which are calculated or reasonably could lead to a viable [False Claims Act] action.' " United States ex rel. Campie v. Gilead Sciences, Inc. , 862 F.3d 890, 907 (9th Cir. 2017) (quoting Moore v. Cal. Inst. of Tech. Jet Propulsion Lab. , 275 F.3d 838, 845 (9th Cir. 2002) ). More specifically, "an employee engages in protected activity where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." Id. Investigation of regulatory noncompliance alone is insufficient. United States ex rel. Hopper v. Anton , 91 F.3d 1261, 1269 (9th Cir. 1996). Yet "[s]pecific awareness of the FCA is not required." Moore , 275 F.3d at 845 ; see also United States ex rel. Yesudian v. Howard Univ. , 153 F.3d 731, 740-41 (D.C. Cir. 1998) ("Nor was it necessary for [the plaintiff] to 'know' that the investigation he was pursuing could lead to a False Claims Act suit."). "An initial investigation may well further an action under the Act, even though the employee does not know it at the time of the investigation." Yesudian , 153 F.3d at 741. In fact, retaliation remains possible even if no FCA violation is ultimately proven or prosecuted. See S. Rep. No. 99-345, at 35 (1986) ("[T]he employer would not have to be proven in violation of the False Claims Act in order for this section to protect the employee's actions."); accord United States ex rel. Satalich v. City of L.A. , 160 F. Supp.2d 1092, 1108 (C.D. Cal. 2001) (collecting cases rejecting necessity of qui tam claim). Defendants' arguments miss this point.
C. Reporting Protocol Violations as Protected Activity
Plaintiff alleges that she engaged in protected activity by reporting Kindler's protocol violations. (Compl. ¶ 67.) Plaintiff does not merely allege that Kindler's conduct ran afoul of FDA regulations. (¶ 68.) She says she reported that "Impulse's agents engaged in conduct that would lead it to misrepresent or omit data that Impulse would submit to the FDA for approval of its medical device." (¶ 69.) If left uncorrected, Plaintiff argues, these protocol violations could reasonably be expected to result in ill-gotten gains-first in the form of FDA approval, then as government payment made possible by that approval. (Opp'n at 7.) No doubt, a plausible theory, as explained below.
The submission of inaccurate data to the FDA could reasonably be linked to an FCA violation. See Campie , 862 F.3d at 907. Indeed, the connection seems all too obvious. FDA approval unlocks a host of coveted government funding, including Medicare and Medicaid. Id. at 897, 905. Such approval depends upon a drug's "safety and effectiveness." Id. at 905. The MLHFQ is a measure of the Optimizer's effectiveness-namely, its impact on quality of life. An improperly administered MLHFQ could generate inaccurate data, which could be used to misrepresent the Optimizer's effectiveness. Should Defendants rely on that data to obtain FDA approval and become eligible for government funds, subsequent claims for reimbursement *609 would plausibly be considered false. See id. at 904, 907.
That FDA approval was then and remains pending bears little significance.[4] Nothing in § 3730(h) requires a completed false claim before protected activity may occur. In fact, the statute's protection of "efforts to stop" FCA violations suggests Congress aimed to protect efforts not merely to expose existing fraud, but to prevent future violations as well. See 31 U.S.C. § 3730(h)(1). To that end, the Ninth Circuit has recognized as protected activity an employee's reports of acts antecedent to the submission of an actual claim for payment, provided a nexus exists between those acts and the prospect of government compensation.[5] See, e.g., Moore , 275 F.3d at 846 (reporting laboratory's lies used to increase government compensation for project's early completion is protected activity); cf. Hopper , 91 F.3d at 1269 (investigating non-compliance with state and federal regulations governing eligibility for special education funding "did not have any nexus to the FCA"). A narrower reading would effectively nullify the FCA's longstanding protection of investigations into "possibly" fraudulent conduct. See Moore , 275 F.3d at 845-46. Worse still, it would merely encourage the swift termination of potential whistleblowers. Were an employee's investigation only to reveal a still-developing scheme to defraud the government, an employer would be free to terminate the employee without fear of liability while simultaneously allowing the scheme's development to proceed unabated. Absent statutory language or case law allowing for such a perverse incentive, the Court declines to so limit § 3730(h) here.
Defendants correctly note that reports of regulatory violations alone are insufficient. See Campie , 862 F.3d at 899, 904. But as the Ninth Circuit reiterated in Campie , the "fatal defect" in such cases is not the presence of a regulatory violation, but the absence of a connection between that violation and a false claim. See id. at 904 (quotations omitted). Plaintiff's retaliation claim suffers no such defect. She alleges that she reported protocol violations which, if left uncorrected, she believed would lead to the submission of false data to the FDA, whose approval is essential to federal funding and reimbursement programs. (Compl. ¶¶ 67-73.) Taking those allegations as true, the Court finds that an adequate nexus exists between those violations and the submission, albeit in the future, of a false claim.
Defendants' attempts to distinguish Campie are unavailing. They argue that the plaintiffs there, who alleged FCA violations based on false statements made to *610 secure FDA approval, "alleged far more" than Plaintiff does here. (Mot. at 10.) This is true. The Campie plaintiffs alleged "false statements permeating the regulatory process." 862 F.3d at 904. These included mislabeling and misbranding of nonconforming drugs and misrepresenting compliance with FDA regulations, then submitting claims for "FDA approved" drugs. Id. The plaintiffs also alleged "false statements regarding test results in order to get FDA approval and thus become eligible for government funds." Id. But Defendants conflate quality with quantity. Nothing in Campie suggests a plaintiff must allege a certain number of regulatory violations for her conduct to be protected. The law merely requires a nexus between the complained-of conduct and government funding. See id. And Plaintiff has plausibly alleged one here.
Defendants' reliance on this Court's decision in Nelson v. Millennium Laboratories, Inc. is similarly misplaced. See No. 2:12-cv-01301-SLG, 2014 WL 11514329 (D. Ariz. June 5, 2014). The plaintiff there had allegedly been fired for investigating what she believed to be violations of federal anti-kickback laws. Id. , at *3, *10. And according to her complaint, she reported these violations while raising the concern that such kickbacks would ultimately generate fraudulent government reimbursements. Id. , at *3. Contrary to Defendants' characterization, however, her FCA claim failed for inadequate evidence to survive summary judgment, not some pleading deficiency. See id. , at *9-*11. The complaint's allegations aside, the evidence failed to reasonably show that the plaintiff was concerned about anything more than compliance with anti-kickback laws when she reported it to her employer. See id. Put another way, there was no evidence of a "good faith" belief that her investigation bore a nexus to fraud against the government. See Campie , 862 F.3d at 907. The same cannot be said here, at least not at the pleading stage.
III. CONCLUSION
Defendants are correct: the FCA is not an all-purpose whistleblower protection statute. See Hopper , 91 F.3d at 1269. Protection is limited to those "who come forward with evidence their employer is defrauding the government." Id. But nothing in that limitation can reasonably be read to forswear protection for those who are only able to investigate the early stages of fraud before they are terminated. The submission of a false statement or claim signifies fraud's end, not its beginning. When an employee reports what she in good faith believes-and reasonably appears-to be the onset of fraud, then, her conduct is no less protected than that of the employee who witnesses that scheme come to fruition. See Campie , 862 F.3d at 907. Plaintiff plausibly alleges as much here.
Accordingly,
IT IS ORDERED denying Defendants' Motion to Dismiss (Doc. 9).

31 U.S.C. § 3730(h) ("Relief from retaliatory actions.").

The Court finds that the issues have been fully briefed and oral argument will not aid in its decision. See Fed. R. Civ. P. 78(b) (permitting resolution of motions without oral hearings); LRCiv 7.2(f) (same).

Because § 3730(h) does not require a showing of fraud, Rule 9(b)'s heightened pleading standard does not apply here. See Mendiondo v. Centinela Hosp. Med. Ctr. , 521 F.3d 1097, 1103 (9th Cir. 2008).

Neither case Defendants cite in suggesting that reports of prospective fraud are not protected activity recognizes such a rule. (See Mot. at 13.) In United States ex rel. Uhlig v. Fluor Corporation , what the Seventh Circuit deemed lacking was not a completed fraudulent act, but an objectively reasonable connection between the plaintiff's reported observations and possible fraud. See 839 F.3d 628, 635 (7th Cir. 2016). Nor does the District of Columbia's decision in Payne v. District of Columbia articulate such a limitation on retaliation claims. See 773 F.Supp.2d 89, 98-99 (D.D.C. 2011).

Other district courts in this circuit have adopted a similar view. See, e.g., Boyd v. Accuray, Inc. , 873 F.Supp.2d 1156, 1164 (N.D. Cal. 2012) (finding no protected activity where regulatory noncompliance lacked connection to possible fraud); Neighorn v. Quest Health Care , 870 F.Supp.2d 1069, 1101 (D. Or. 2012) (finding no protected activity where internal policy compliance was not a condition of government payment); Sicilia v. Boeing Co. , 775 F.Supp.2d 1243, 1253 (W.D. Wash. 2011) (granting summary judgment for failure "to demonstrate any false claim, any false certification, any intentional lie, and any government contract contingent on" the complained-of misconduct).