**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| THOMAS MOONEY, | Nos. 22-16328 |
| *Plaintiff-Appellant*, | 23-15158 |
| v. | D.C. No. |
| DOUGLAS FIFE, M.D.; HEATHER FIFE; FIFE DERMATOLOGY, PC, DBA Surgical Dermatology & Laser Center, DBA Vivida Dermatology, | 2:17-cv-02191-JCM-EJY |
| *Defendants-Appellees*, | OPINION |
| and | |
| ALAN ARNOLD, M.D.; VICTORIA FARLEY, M.D.; ELIZABETH LANGFORD, D.O.; MAC MACHAN, M.D., | |
| *Defendants*. | |

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted March 5, 2024
Las Vegas, Nevada

Filed September 30, 2024

Before:  Milan D. Smith, Jr., Mark J. Bennett, and Daniel
P. Collins, Circuit Judges.

Opinion by Judge Bennett;
Partial Concurrence by Judge Collins

## SUMMARY[*]

### False Claims Act

The panel reversed the district court's summary judgment in favor of the defendants in a qui tam action under the False Claims Act and remanded for further proceedings.

Plaintiff Thomas Mooney was employed as chief operating officer for Dr. Douglas Fife, his wife Heather Fife, and Fife Dermatology, PC, d/b/a Vivida Dermatology. Mooney alleged concerns about improper billing practices at Vivida. Following a conversation between Mooney and a dermatologist belonging to another practice, Vivida terminated his employment, citing unauthorized disclosure of confidential information in violation of Mooney's employment agreement.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that a False Claims Act retaliation claim requires proof of three elements: (1) protected conduct; (2) notice; and (3) causation. Following most of the other circuits that had considered the issue, the panel clarified that in analyzing a retaliation claim, a court must use the *McDonnell Douglas* burden-shifting framework, rather than the *Mt. Healthy* framework commonly applied to First Amendment retaliation claims. Under the *McDonnell Douglas* framework, once an employee has established a prima facie case of retaliation, the burden shifts to the employer to produce a legitimate, non-retaliatory reason for the employee's termination. Then, if the employer produces such a reason, the burden shifts to the employee to show that the proffered explanation was pretextual.

In 2009, Congress amended 31 U.S.C. § 3730(h) to provide that, in addition to protecting lawful acts done by the employee, the False Claims Act also protects employees from being discharged because of efforts to stop violations of the Act. Prior to this amendment, this court held that, under the *Moore* test, protected conduct had both a subjective and an objective component. Thus, an employee engaged in protected activity where (1) the employee in good faith believed, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer was possibly committing fraud against the government. In *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261 (9th Cir. 1996), this court also held that the employee must be investigating matters that were calculated, or reasonably could lead, to a viable action under the False Claims Act. Agreeing with the Eleventh Circuit, the panel held that *Hopper*'s "investigating" requirement does not apply when the employee alleges that he was discharged because of efforts to stop violations of the Act. The panel further held

that the *Moore* test continues to apply following the 2009 amendment.

Applying this post-2009 amendment test, the panel concluded that, at the summary judgment stage, Mooney engaged in protected conduct that satisfied the first element of a retaliation claim. Viewing the evidence in the light most favorable to Mooney, he subjectively and objectively believed that Vivida was possibly committing fraud against the government.

The panel concluded that Mooney also met the notice requirement of a prima facie case, which requires a showing that the employer must have known that the employee was engaging in protected conduct. Disagreeing with other circuits, the panel held that it was irrelevant that Mooney had a job duty to ensure compliance with billing regulations and to report irregularities.

Vivida did not challenge causation, the third element of a prima facie case, and so the burden shifted to Vivida to produce a legitimate, non-retaliatory reason for Mooney's termination. The panel held that Mooney established genuine issues of material fact whether the reasons proffered by Vivida were pretextual. The panel therefore reversed the district court's grant of summary judgment as to Mooney's claim for False Claims Act retaliation and remanded that claim for trial.

The panel also reversed the district court's grant of summary judgment on Mooney's claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

Concurring in part and in the judgment, Judge Collins wrote that he concurred in the court's opinion except for its

holding that the subjective and objective components for protected activity, adopted in *Moore* with respect to the prior version of the False Claims Act, also apply in determining whether an employee engaged in protected conduct in the form of efforts to stop violations of the False Claims Act. Judge Collins wrote that this amended language seems to suggest a stronger objective component than the one described in *Moore*. Nonetheless, even assuming *arguendo* that Mooney had to show that Vivida was likely engaged in False Claims Act violations that he made efforts to stop, Judge Collins thought his evidence was sufficient to raise a triable issue of fact on that score.

## COUNSEL

James P. Kemp (argued), Kemp & Kemp, Las Vegas, Nevada, for Plaintiff-Appellant.

Kelly H. Dove (argued), Paul S. Prior, and Hayley J. Cummings, Snell & Wilmer LLP, Las Vegas, Nevada, for Defendants-Appellees.

**OPINION**

BENNETT, Circuit Judge:

In 2017, Dr. Douglas Fife, his wife Heather Fife, and Fife Dermatology, PC d/b/a Vivida Dermatology (collectively, "Vivida") hired Thomas Mooney as its Chief Operating Officer ("COO") under a three-year agreement. Under the agreement, Vivida could immediately terminate Mooney's employment for cause, including for a violation of any confidentiality provision in the agreement. Mooney, responsible for operational management and compliance, alleged concerns about improper billing practices at Vivida. Following a conversation between Mooney and Dr. Ken Landow, a dermatologist belonging to another practice, Vivida terminated his employment, citing unauthorized disclosure of confidential information. Mooney initiated a qui tam action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–33, which he later voluntarily dismissed. He then amended the complaint, which included claims for FCA retaliation, breach of contract, and breach of the implied covenant of good faith and fair dealing. The district court granted summary judgment for Vivida on all three claims.

We have jurisdiction under 28 U.S.C. § 1291. Because we hold that the district court erred in applying the relevant substantive law for Mooney's FCA retaliation claim and failed to view the evidence in the light most favorable to Mooney for his breach of contract and breach of the covenant of good faith and fair dealing claims, we reverse and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Vivida Dermatology is a dermatology practice founded in 2009.  In the spring of 2017, Vivida hired Mooney as its Chief Operating Officer ("COO" or an "Executive Director").  Vivida and Mooney signed the "Executive Director Employment Agreement" ("Agreement"). Mooney's first experience overseeing a dermatology practice was with Vivida, though he had managed practices in other fields such as orthopedics and physical therapy.

Under the Agreement, Mooney's employment began on April 3, 2017, for a three-year initial term.  But under § 7(a) of the Agreement, Vivida could terminate Mooney's "employment . . . immediately and without advance notice upon the existence of '[c]ause' (as defined in subsection (b), below)."  Section 7 of the Agreement also provides:

> a) <u>Termination for Cause</u>. . . .  In the event of termination for [c]ause, all obligations of the Company[1] under this Agreement will immediately cease, and no payments of any kind, including payment of salary and fringe benefits accrued through the date of termination will thereafter be made in respect of the remaining term of this Agreement.  As used herein with respect to termination by the Company, "[c]ause" shall mean failure to meet any of the requirements of Sections 3 and 4 above or for any other conduct

---

[1] The Agreement defines "FIFE DERMATOLOGY, P.C., a Nevada professional corporation d/b/a Surgical Dermatology & Laser Center" as the "Company."

constituting "just cause" [f]or termination under Nevada common law.

b) For purposes of this Agreement, the term "[c]ause" shall include the following:

> . . .
>
> 2) Administrator's[2] violation of any terms and conditions of this agreement, including, but not limited to, any confidentiality provision[.]

The "any confidentiality provision" mentioned in § 7(b)(2) refers to § 8(a), which in turn provides:

> **Confidentiality.** Administrator shall not at any time, except as required in the normal course of his engagement hereunder, directly or indirectly, divulge, disclose or communicate to any person, firm or corporation, in any manner whatsoever, or make any use of any information concerning any matters affecting or relating to the business of the Company, including, without limitation, . . . any other information concerning the business of the Company, its manner of operation, its plans, processes, or other data, or any information ascertained by Administrator through Administrator's employment with the Company (the "Protected Information") regardless of whether any of the Protected Information

---

[2] The Agreement defines "Thomas J. Mooney" as the "Administrator."

> would be deemed confidential, material or important; the parties hereto stipulating that as between them, the same are important, material and confidential and gravely affect the effective and successful conduct of the business of the Company and the Company's good will. . . .

Mooney later testified that "its plans" as used in § 8(a) "include prospective acquisition of other dermatologists['] practices."

As Vivida's COO, Mooney was responsible "for the operational management and business administration of the Company." The Agreement's Addendum A ("Job Description") lists specific COO duties, including:

> 6. Manag[ing] all financial functions including overseeing the monthly reporting for the CEO's meeting with providers regarding their production and practice financials.
>
> 7. Troubleshoot[ing] all problems and identifies proactive solutions to minimize reoccurrence.
>
> . . . .
>
> 16. Proactively seek[ing] education about changes in healthcare regulation, and prepar[ing] the practice to take advantage of

opportunities and minimiz[ing] potential damage caused by these changes.

Mooney testified in his deposition that "based on t[he] [A]greement and the responsibilities set forth in the Addendum," it was his "role to make sure that Vivida complied with Medicare and Medicaid regulations" and "to alert Vivida if it was not complying with [such] regulations."

During Mooney's employment with Vivida, he came to believe that Vivida was:

> a.      "upcoding" patient visits to reflect a higher level of patient care than was actually provided;
>
> b.      illegally "unbundling" services and treatments so as to claim more reimbursement from Medicare and Nevada Medicaid than the Practice was entitled to; and
>
> c.      calling uncertified staff "Medical Assistants" and permitting them to see patients and document in the electronic medical records without the doctor being present which would result in improperly increased billing amounts for medical services in violation of Medicare and Nevada Medicaid regulations.

According to Mooney, he "would . . . raise these issues with Dr. Fife at [thei]r weekly one-on-one meetings on Fridays," and he "confronted Dr. Fife in at least four or five of these meetings." Those meetings included their one-on-one on June 16, 2017, when Mooney allegedly "reiterated to

Dr. Fife [his] concerns about the upcoding, explaining that [he] thought the practice created significant legal liability risk."

Mooney also testified about his conversations with Dr. Landow, a dermatologist at a different practice, on Thursday, June 1, 2017, which eventually led to his termination at Vivida.

> Dr. Landow approached me and he asked me about where we—were we doing something with Dr. [Saul] Schreiber's practice. And I said we are in the market as you know because we're here looking at your practice and if you have any issues or concerns please address them with Dr. Fife.

He also testified that "Dr. Landow asked me if we were purchasing or going to acquire or do anything with Dr. Schreiber and I said as I've said a couple of times here, Fife Dermatology is looking at a lot of different things as you know and if you have any concerns about anything please give Dr. Fife a call."

On June 21, 2017, Vivida, via its counsel, sent a letter terminating Mooney's employment for cause under the Agreement ("Termination Letter"): "Due to your direct violation of the Agreement, the Company has elected to terminate your employment for [c]ause, effective immediately." The Termination Letter explained the reasons for Mooney's termination:

> Upon information and belief, on or about June 1, 2017, you disclosed to a prospective employee, Ken Landow, M.D., of the

> Company's intention to acquire Advanced
> Dermatology, owned by Saul Schreiber, D.O.
> On that same day, Dr. Landow told Dr. Fife,
> "I had a visit from [Mooney] today, and he
> said that you were considering purchasing
> Saul Schreiber's office." When you were
> confronted by Dr. Fife regarding this
> unauthorized disclosure, you simply
> responded that you were unaware the
> information was confidential.

Vivida provided little detail about the "confrontation."
Mooney disputed that the confrontation ever happened. He
testified:

> I wasn't confronted by Dr. Fife. I called Dr.
> Fife after a meeting with . . . Ken Landow and
> told him that he was highly upset and if we
> were doing anything with Saul Schreiber's
> office that there's no way he was going to
> move forward with this potential merger.
> And I told Dr. Fife that he should expect a
> call from Dr. Landow and he was pretty
> upset. So Dr. Fife told me, don't worry, I'll
> handle it.

The Termination Letter further explained:

> It is irrelevant whether you were aware that
> the information was confidential in nature,
> and unfortunately, this explanation is
> insufficient. You were obligated to maintain
> all Company Protected Information (as
> defined in Section 8(a) of the Agreement)

confidential, *regardless of whether the Protected Information would be deemed confidential, material or important*. The Agreement expressly forbids you from sharing to any person the Company's business plans. Further, the Company's business plans are specifically identified in the Agreement as Protected Information under the confidentiality clause.

Dr. Fife further explained Vivida's termination decision in his deposition. He testified that "Dr. Landow was a very well-trained dermatologist, very experienced, very renowned, and [Dr. Schreiber] was kind of not—you know, he was retiring. And we would just be taking over his charts, but he was not a well-trained dermatologist and did not have a good reputation in town." Vivida had been "looking at acquiring [Dr. Landow's] practice and then having him work part-time." But because of Mooney's supposed disclosure to Dr. Landow about Vivida's potential acquisition of Dr. Schreiber's practice, Dr. Landow "was kind of offended that we were considering buying both of their practices and thinking like, oh, am I going to be a colleague with this other guy." Dr. Fife believed that Mooney's disclosure had "seriously damaged [Dr. Fife's] relationship with Dr. Landow."

On August 15, 2017, Mooney filed an FCA qui tam action against Vivida. On June 4, 2020, Mooney voluntarily dismissed the FCA claims. On July 15, 2021, Mooney moved to file a Second Amended Complaint, which added claims for retaliation under the FCA, breach of contract, and breach of the implied covenant of good faith and fair dealing.

The district court granted the motion, and the Second Amended Complaint was filed on December 22, 2021.

On August 29, 2022, after the close of discovery, the district court granted summary judgment to Vivida on Mooney's three remaining claims.  The district court concluded that Mooney's FCA retaliation claim failed because "[e]nsuring compliance with billing regulations and reporting irregularities" were activities Mooney was hired to do, and his reporting did not put Vivida on notice of potentially protected conduct.

As to the breach of contract claim, the district court found that the Agreement is unambiguous and that Mooney's "deposition testimony proves that he disclosed information he knew could be confidential—the acquisition plans—by stating Vivida was 'in the market,' thus violating § 8(a) of the employment agreement."

Finally, the district court determined that Mooney's breach of the implied covenant of good faith and fair dealing claim also failed.  The court noted that, under Nevada law, such a claim is viable "[w]here the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract."  (alterations in original) (quoting *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 808 P.2d 919, 922–23 (Nev. 1991)).  The district court granted summary judgment because Mooney "never argue[d] that [Vivida] literally complied with the contract" and instead only pled that "he did not breach confidentiality and therefore should not have been terminated."

After the district court granted Vivida's motion for summary judgment on all claims and entered judgment for Vivida, Vivida moved for an award of attorneys' fees.  The

district court granted the motion, on the grounds that Vivida was a "prevailing party" under § 13(h) of the Agreement.

Mooney timely appeals.

## II.  STANDARD OF REVIEW

We review a grant of summary judgment de novo, *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1408 (9th Cir. 1996), "viewing the evidence in the light most favorable to the nonmoving party" and determining whether "there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law," *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

## III.    DISCUSSION

### A.  The District Court Erred in Applying the Relevant Substantive Law for Mooney's FCA Retaliation Claim.

#### 1.    The FCA's Three Elements and the Burden-Shifting Framework

The FCA protects "[a]ny employee" from being "discharged . . . because of lawful acts done by the employee . . . in furtherance of an [FCA] action . . . or other efforts to stop 1 or more violations of [the FCA]."  31 U.S.C. § 3730(h)(1).  "An FCA retaliation claim requires proof of three elements": (1) protected conduct, that is, "the employee must have been engaging in conduct protected under the Act"; (2) notice, that is, "the employer must have known that the employee was engaging in such conduct"; and (3) causation, that is, "the employer must have discriminated against the employee because of her protected conduct."  *U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys.,*

*Inc.*, 637 F.3d 1047, 1060 (9th Cir. 2011) (quoting *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996)).

As some courts have recognized, we have not expressly determined which framework we should use in analyzing FCA retaliation claims. *See, e.g.*, *U.S. ex rel. Berglund v. Boeing Co.*, 835 F. Supp. 2d 1020, 1040 (D. Or. 2011). Some courts have applied the *McDonnell Douglas* burden-shifting framework to FCA retaliation claims that we apply to similar retaliation claims under Title VII and other statutes (such as the Americans with Disabilities Act (ADA) and the Age Discrimination in Employment Act (ADEA)). *See, e.g.*, *id.*; *Lestage v. Coloplast Corp.*, 982 F.3d 37, 47 (1st Cir. 2020); *U.S. ex rel. Strubbe v. Crawford Cnty. Mem'l Hosp.*, 915 F.3d 1158, 1168 (8th Cir. 2019); *U.S. ex rel. King v. Solvay Pharms., Inc.*, 871 F.3d 318, 332 (5th Cir. 2017); *U.S. ex rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1241 (D.C. Cir. 2012); *see also N.Y. ex rel. Khurana v. Spherion Corp.*, 511 F. Supp. 3d 455, 480 n.13 (S.D.N.Y. 2021) (applying the *McDonnell Douglas* framework to claims made under the New York (State) False Claims Act and New York City False Claims Act); *Nifong v. SOC, LLC*, 234 F. Supp. 3d 739, 750–51 (E.D. Va. 2017) (applying the *McDonnell Douglas* framework to an FCA retaliation claim while acknowledging that "the Fourth Circuit has not directly held that the *McDonnell Douglas* framework operates in FCA retaliation cases.").

Under that framework, once the employee has established a prima facie case of FCA retaliation, the burden shifts to the employer to produce a legitimate, non-retaliatory reason for the employee's termination. *Erickson v. Biogen, Inc.*, 417 F. Supp. 3d 1369, 1384 (W.D. Wash. 2019). Then, if the employer "produces [such] a . . . reason,"

the burden shifts to the employee "to show that the proffered explanation was pretextual." *Id.*

Some courts have seemingly adopted a different framework that we commonly apply to First Amendment retaliation claims, drawn from the Supreme Court's decision in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977). Under that framework, the burden of *proof*—and not merely the burden of production—shifts to the employer once the plaintiff establishes a prima facie case. *See Allen v. Iranon*, 283 F.3d 1070, 1074–75 (9th Cir. 2002) (expressly distinguishing between the *McDonnell Douglas* burden-shifting framework and the *Mt. Healthy* framework). Specifically, "[a plaintiff] first ha[s] to show that his conduct was constitutionally protected and that the conduct was a 'substantial' or 'motivating' factor in the defendants' employment decisions." *Id.* at 1074. "After he ma[kes] these showings, the defendants could escape liability only by sustaining the burden of proving 'by a preponderance of the evidence that [they] would have reached the same decision . . . even in the absence of the [plaintiff's] protected conduct." *Id*. (second and third alterations and omission in original) (quoting *Mt. Healthy*, 429 U.S. at 287). The *Mt. Healthy* framework applies to First Amendment retaliation claims "regardless of whether the plaintiff uses direct or circumstantial evidence to prove that there was a retaliatory motive behind the adverse employment action." *Id*. at 1075.

The Third Circuit appears to have adopted the *Mt. Healthy* framework in the FCA retaliation context. *See Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 186 (3d Cir. 2001) (adopting a standard under which "the burden shifts to the employer to *prove* the employee would have

been terminated even if he had not engaged in the protected conduct" (emphasis added)).[3]

We clarify today that the *McDonnell Douglas* burden-shifting framework—rather than the *Mt. Healthy* framework—applies to FCA retaliation claims. We find support in our precedent in *Stilwell v. City of Williams*, 831 F.3d 1234 (9th Cir. 2016). There, we explained why the *Mt. Healthy* standard applicable to First Amendment claims under § 1983 does not apply to ADEA retaliation claims. *See id.* at 1246–47. We relied on the higher burden of causation applicable to Title VII retaliation claims under *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013), which we held would apply to ADEA retaliation claims. *Stilwell*, 831 F.3d at 1246–47. That same logic applies to the FCA retaliation provision, which uses "because of" language similar to that found controlling by the Court in *University of Texas*. *See* 570 U.S. at 352 (stating that "because [of]" language generally requires "but-for caus[ation]"). We thus conclude that the same legal framework applicable to Title VII, ADEA, and ADA retaliation claims should apply to FCA retaliation claims. In doing so, we reach the same conclusion as most of our sister circuits that have considered the issue.

The district court granted summary judgment because it concluded that Mooney failed to satisfy the second element (notice) of an FCA retaliation claim. The parties also dispute whether the first element (protected conduct) is satisfied. And even if Mooney could made out a prima facie FCA

---

[3] *But see Schweizer*, 677 F.3d at 1241 n.14 (describing the approach in *Hutchins* as being "similar" to the *McDonnell-Douglas* burden-shifting framework).

retaliation claim, the parties dispute whether Vivida's proffered reason for terminating Mooney was pretextual.

## 2.    Protected Conduct

The FCA only applies when an employee engages in protected conduct, that is, "conduct protected under the [FCA]." *Cafasso*, 637 F.3d at 1060 (citation omitted). Until 2009, however, protected conduct included only "lawful acts done by the employee . . . *in furtherance of an* [*FCA*] *action*." 31 U.S.C. § 3730(h) (2008) (emphasis added). The circuit courts split over what that meant. Some circuit courts held that protected conduct *only* encompassed "either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government." *U.S. ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996), *superseded by statute*, 31 U.S.C. § 3730(h) (2009). Under that interpretation, an employee who, for example, "merely informed a supervisor of [an FCA violation] and sought confirmation that a correction was made" but never "initiated, testified for, or assisted in the filing of a *qui tam* action" did not engage in protected conduct. *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 914 (4th Cir. 1997), *superseded by statute*, 31 U.S.C. § 3130(h) (2009). Other circuit courts read the FCA's "in furtherance of" language more broadly to include protection against "retaliation for filing an internal complaint." *U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1109 (7th Cir. 2014) (describing and citing the Seventh Circuit's pre-2009 precedent); *see also U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 741 (D.C. Cir. 1998) ("[T]he district court was wrong in suggesting that Yesudian's activity was unprotected because he had not initiated a private suit by the time of his termination.").

Congress amended 31 U.S.C. § 3730(h) in 2009. Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1624–25 (2009). That subsection now provides that, in addition to protecting "lawful acts done by the employee . . . in furtherance of an [FCA] action," the FCA also protects employees from being "discharged . . . because of . . . other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h). As the Eleventh Circuit noted after the amendment:

> Now, besides protecting employees who take steps "in furtherance of" a[n] [FCA] suit, the law protects employees who engage in "efforts to stop 1 or more violations" of the [FCA]. 31 U.S.C. § 3730(h)(1). In other words, the amendments expanded retaliation coverage to at least some set of people who make "efforts to stop" [FCA] violations—*even if those efforts do not lead to a lawsuit or to the "distinct possibility" of a lawsuit*.

*Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1288 (11th Cir. 2021) (emphasis added).

Prior to 2009, we adopted a test for the "protected conduct" element that has both a subjective and objective component. We held that "an employee engages in protected activity where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab'y*, 275 F.3d 838, 845 (9th Cir. 2002). We also required that the employee "must be investigating matters which are calculated, or reasonably

could lead, to a viable FCA action." *Hopper*, 91 F.3d at 1269.

Since 2009, we have not addressed whether the *Moore* test or the "investigating" requirement in *Hopper* survives the FCA's amendment. In two unpublished dispositions, we continued to apply both. *See Tribble v. Raytheon Co.*, 414 F. App'x 98, 99 (9th Cir. 2011) (affirming the district court's conclusion that Tribble had not engaged in protected conduct under the FCA because "[t]here is no evidence that [he] took any additional steps to pursue the alleged latent defect after the submission of his PowerPoint presentation, nor that he believed Raytheon's failure to investigate the latent defect constituted fraud against the U.S. government"); *Lillie v. ManTech Int'l Corp.*, 837 F. App'x 455, 457 (9th Cir. 2020) ("To prove that he engaged in conduct protected under the False Claims Act, the plaintiff must show that he investigated his employer on the basis of a reasonable and good faith belief that his employer might have been committing fraud against the government.").

We hold today that *Hopper*'s "investigating" requirement does not apply when the plaintiff alleges that he was "discharged . . . because of . . . other efforts to stop 1 or more violations of [the FCA]," as Mooney does here.[4] We agree with the Eleventh Circuit that an employee's "efforts to stop 1 or more violations" need "not lead to a lawsuit or to the 'distinct possibility' of a lawsuit." *Hickman*, 985 F.3d at 1288. It necessarily follows from that conclusion that the employee should not be required to "be investigating matters

---

[4] The "investigating" requirement continues to apply if the plaintiff only alleges that he was "discharged . . . because of lawful acts done by the employee . . . in furtherance of an [FCA] action." 31 U.S.C. § 3730(h)(1).

which are calculated, or reasonably could lead, to *a viable FCA action*." *Hopper*, 91 F.3d at 1269 (emphasis added).

We further hold that the test we adopted in *Moore* for the "protected conduct" element that has both a subjective and objective component continues to apply following the 2009 amendment. We note, however, that this test does not set a high bar. For the subjective component, *Moore* only required that "the employee in good faith believe[] . . . that the employer is *possibly* committing fraud against the government." 275 F.3d at 845 (emphasis added). Thus, the employee need not know for certain that the employer has committed fraud. Similarly, for the objective component, *Moore* held that "a reasonable employee in the same or similar circumstances *might* believe, that the employer is *possibly* committing fraud against the government." *Id.* (emphasis added). Applying this post-2009 amendment test—and viewing the evidence in the light most favorable to Mooney—we conclude that, at this summary judgment stage, Mooney *did* engage in protected conduct that satisfies the first element of an FCA retaliation claim.

Through admissible evidence, Mooney stated that he has "30[-]plus years of experience in management of medical practices":

> [A]lthough that experience did not include specifically managing a dermatology practice like [Vivida,] [Mooney] do[es] have extensive experience and knowledge of the rules and regulations and proper practices of billing insurance and Medicare for medical services. [His] experience is such that [*he*] *can recognize issues of improper billing and fraudulent billing* and what [he] saw being

done at [Vivida] reasonably appeared to [him] to be across the line into illegal and fraudulent unbundling, upcoding, and improperly billing non-physician time and tasks as being the work of physicians in the way in which it was recorded in the electronic medical record system being utilized by [Vivida].

(emphasis added).

He added that he "observed and became aware of through [his] work, *including reviewing reports*, what [he] reasonably believed to be fraudulent and improper billing practices." He explained:

[He] made Dr. Fife, the sole owner of the practice who had 15 years of running a dermatology practice, aware of [his] concerns by *directly addressing the matters with Dr. Fife on four or five occasions including one instance less than one week prior* [*his*] *being fired*. [Mooney] contend[s] that these practices were actually unlawful based on [his] personal observations and information that [he] learned directly by working [at Vivida]. If the information was going into the electronic medical records and the electronic medical records were being used to formulate and produce bills to Medicare and Medicaid then *it is a reasonable inference for* [*him*] *to draw and conclude* that there was fraudulent billing in

fact going out to the state and federal government from [Vivida].

(emphasis added).

Mooney also alleged specific instances of improper billing practices. First, he stated that Ms. Kila Ohlsen, "an employee who was tasked with reviewing [Vivida's] coding for insurance claims (including Medicare and Medicaid) but was not a certified coder, complained frequently to [him] about how she felt that she might be risking legal exposure by following Fife's instructions regarding coding and billing."[5] Second, he stated that, at a meeting in June 2017, he "told the clinical staff that their practice of coding for a full skin examination based only on glancing observation of a clothed patient's exposed skin was inappropriate upcoding, especially when this 'examination' was performed by uncertified or unqualified staff masquerading as 'Medical Assistants,' who could not (and so did not) discuss any of their 'findings' with the patient."

Because Mooney's statements are "to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), we easily conclude that in the light most favorable to Mooney, he did subjectively and objectively believe that Vivida was possibly committing fraud against the government. This satisfies the first element of an FCA retaliation claim.

Vivida argues that Mooney did not engage in protected conduct because, first, Mooney has cited no evidence in the

---

[5] Ms. Ohlsen was not deposed. According to Dr. Fife, she was no longer with Vivida by the time of Dr. Fife's deposition.

record that Vivida's billing practices potentially violated any law or regulation, and second, Mooney has not shown that he had any reasonable basis for believing as much. Neither argument is persuasive. First, as Mooney stated, he had no opportunity to complete his investigation (though as we hold above, investigation is not required for this element), when he was fired shortly after he started noticing irregularities in Vivida's billing practices. Mooney explained in his opposition below that "[h]e made observations and reviewed reports, but he had not completed an investigation by actually reviewing the bills themselves or to take other steps to conclusively confirm the fraud" when "[h]e was fired about 11 weeks into his . . . employment contract before he could even complete his assessment of [Vivida] and complete his investigation into the fraud." Requiring more would conflict with the FCA's retaliation provision in § 3730(h)(1), undermine the goal of exposing fraud, and motivate employers to terminate an employee before he definitely uncovers fraud. Indeed, as Mooney stated, because he was terminated by Vivida, he could "not complete the investigation and potentially turn over information regarding the apparent fraudulent billing to the government."

Second, Mooney's 30-plus years of experience in management of the business side of medical practices, as well as his conversations with Ms. Ohlsen and the clinical staff, would enable him to form good-faith and objectively reasonable beliefs as to the alleged fraud. Moreover, at least some of the alleged improper billing practices are common enough that Mooney could uncover fraud on an "I-know-it-when-I-see-it" basis. For example, the Sixth Circuit has noted that "[u]pcoding" is "a common form of Medicare fraud," which "is the practice of billing Medicare

for medical services or equipment designated under a code that is more expensive than what a patient actually needed or was provided." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 637 n.3 (6th Cir. 2003) (citing Bonnie Schreiber et al., *Health Care Fraud*, 39 Am. Crim. L. Rev. 707, 750 n.331 (2002)). The U.S. Department of Health and Human Services has also noted that upcoding is a "common type of false claim." Office of Inspector General, U.S. Department of Health and Human Services, *I. Physician Relationships With Payers*, https://oig.hhs.gov/compliance/ physician-education/i-physician-relationships-with-payers. *See also, e.g.*, *Bledsoe*, 342 F.3d at 637 (noting that the relator's complaint alleged violations of the FCA by, in addition to miscoding and upcoding, "unbundling services and billing Medicare and Medicaid"); *id.* at 638 n.4 (defining "unbundling" as a category of medical fraud that "occurs when a health provider, who initially issues a service as one package, breaks down the service into component parts and finds individual reimbursement codes for those components, so long as the individual rates combined exceed the global rate" (citing Schreiber et al., *supra*, at 750 n.331)); *U.S. ex rel. Gutman v. Chi. Vein Inst.*, No. 1:16-CV-09734, 2021 WL 170674, at \*1 (N.D. Ill. Jan. 19, 2021) (noting that the relator's complaint alleged that, among other things, the defendant "billed procedures performed by underqualified medical staff, then resubmitted these claims with Dr. Sunje as the procedure provider, even though he had not performed the procedures" (citation omitted)); *U.S. ex rel. Williams v. Med. Support L.A.*, No. CV 20-0198-CBM-(DFMx), 2022 WL 15399977, at \*3 (C.D. Cal. Sept. 26, 2022), *aff'd sub nom. Williams v. Med. Support L.A.*, No. 22-55979, 2023 WL 8798089 (9th Cir. Dec. 20, 2023) ("The [Second Amended Complaint]'s new theory of fraudulent

inducement is based on [the defendant]'s alleged delegation of the above 'components of the [medical disability examinations]' to 'unlicensed and unqualified . . . employees [of the defendant]' and 'misrepresent[ation] to the VA that such work had been performed by properly-credentialled medical examiners.'" (last alteration in original)). Therefore, given how common and prevalent at least some of the alleged improper billing practices are, Vivida's argument that Mooney must "explain[] how any billing violated any law or regulation" fails.

We thus conclude that Mooney engaged in protected conduct, at this stage.

3.   Notice

Having concluded that Mooney engaged in protected conduct, we move to the notice element of an FCA retaliation claim, that is, whether "the employer must have known that the employee was engaging in such conduct." *Cafasso*, 637 F.3d at 1060 (citation omitted).

Vivida puts forward a theory that distinguishes employees *with* compliance duties from those *without* compliance duties: "[B]ecause ensuring compliance with billing regulations and reporting irregularities were activities Mooney was hired to do, his reporting did not put Vivida on notice of potentially protected activity." Vivida's theory was adopted by the district court.

The district court relied on *United States ex rel. Cafasso v. General Dynamics C4 Systems, Inc.*, No. CV 06-1381 PHX NVW, 2009 WL 1457036 (D. Ariz. May 21, 2009), *aff'd on other grounds*, 637 F.3d 1047 (9th Cir. 2011). There, the district court held: "Where a plaintiff merely

advised her superiors of noncompliance and warned of consequences for noncompliance, and *her monitoring and reporting activities were required to fulfill her job duties*, defendants did not have notice the plaintiff was furthering or intended to further an FCA action."  *Id.* at \*10 (emphasis added) (citing *Ramseyer*, 90 F.3d at 1523).

Similarly, Vivida cites *Dunlap v. Imaging Associates, LLC*, No. 3:14-cv-00143-TMB, 2019 WL 4580611 (D. Alaska Sept. 20, 2019), in which the district court held that, "[u]nder Ninth Circuit law, a plaintiff whose job responsibilities include compliance must meet a higher standard to place h[is] employer on notice of protected activity."  *Id.* at \*17.

First, *Dunlap* is incorrect that we have endorsed Vivida's theory.  While other circuits have done so, we have not.[6]

---

[6] In *United States ex rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d 890 (9th Cir. 2017), we cited the Tenth Circuit case, *Ramseyer*, with approval:

> That said, as noted by the district court, the monitoring and reporting activities outlined by relators are by-and-large the types of activities Campie was required to undertake as part of his job.  Courts have held that when an employee is tasked with such investigations, it takes more than an employer's knowledge of that

*Compare* Note 6, *supra*, *with Ramseyer*, 90 F.3d at 1523 (the Tenth Circuit endorsing this theory), *and Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 952 (5th Cir. 1994) ("[Because] Robertson's actions were consistent with the performance of his duty, as a contract administrator, to substantiate requests for additional funding . . . , Robertson has identified no change in his conduct that might have objectively demonstrated his *qui tam* intentions."), *and U.S. ex rel. Parks v. Alpharma*, Inc., 493 F. App'x 380, 389 (4th Cir. 2012) (holding that "complaints [that] were clearly couched in terms of concerns and suggestions, not threats or warnings of FCA litigation" are not enough to put an employer on notice).

---

activity to show that an employer was on notice of a potential *qui tam* suit.

*Id.* at 908 (citing *Ramseyer*, 90 F.3d at 1523).  But this is dicta.  Indeed, while finding *Ramseyer* "instructive," the *Campie* panel held that the complaint there alleged sufficient facts because:

Here, the Second Amended Complaint alleges that "Mr. Campie made clear that he expected Gilead to stop its deceptive practices and *threatened to inform the FDA* if Gilead continued its fraudulent conduct." Second, Campie alleges he was "selectively circumvent[ed]" and exclud[ed]" from the regulatory review process in which he was meant to take part, was told certain regulatory compliance actions, such as issuing a quarantine, were "not in his job description," and had conversations outside of his chain of command regarding his concerns.

*Id.* (emphasis added) (alterations in original).

We decline to follow this approach because it is inconsistent with the plain language of the FCA following the 2009 amendment.

First, as we noted when interpreting another section of the FCA, "[i]t is well established that the 'starting point in discerning congressional intent is the existing statutory text' and that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Schroeder v. United States*, 793 F.3d 1080, 1082–83 (9th Cir. 2015); *see also Carcieri v. Salazar*, 555 U.S. 379, 387 (2009).  Section 3730(h)(1) provides:

> *Any employee* . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged . . . because of lawful acts done by the employee . . . in furtherance of an action under this section or *other efforts to stop 1 or more violations* of this subchapter.

31 U.S.C. § 3730(h)(1) (emphasis added). Section 3730(h)(1) grants protection to "[a]ny employee" who is retaliated against for protected conduct.  The plain and unambiguous language of the statute thus does not limit its application to only employees who do not have any compliance duties.  Nor does it distinguish between those with compliance duties and those without.

Second, attaching a higher standard of notice to employees with compliance duties makes little sense after the FCA's amendment.  The amended § 3730(h)(1) provides that protected conduct also includes "other efforts to stop 1 or more violations of [the FCA]."  31 U.S.C. § 3730(h)(1).

Those other efforts may or may not lead to a potential qui tam suit. Thus, the relevant inquiry is not whether "an employer was on notice of a potential *qui tam* suit," *Campie*, 862 F.3d at 908, but whether the employer was on notice of "other efforts to stop 1 or more violations" of the FCA.

Finally, limiting the application of § 3730(h)(1) as Vivida and certain courts have suggested would strip protection from the employees who are in the best position to stop, or uncover and expose, the fraud against the federal government that the FCA seeks to prevent or eliminate. If an employee like Mooney were to have no protection from retaliation under § 3730(h)(1) because one of his several job duties was to help ensure compliance with Medicare and Medicaid billing laws, then fear of that retaliation could intimidate and discourage employees in such positions from trying to stop fraudulent billing practices. This is inconsistent with, indeed the opposite of, Congress's intent in providing protection to employees who make "other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1).[7]

We thus hold that the district court erred in applying the substantive law: Section 3730(h)(1) does *not* hold an employee with compliance duties to a different standard than employees without such duties. Regardless of whether the employee has compliance duties, to satisfy the second element—the notice requirement—of an FCA retaliation claim, the employer need only be aware of *an* employee's

---

[7] In enacting this FCA provision, Congress's presumed intent was to prevent retaliation against those who were trying to stop fraud against the federal government. Given that aim, it is hard to see why Congress would condition protection on whether the individual employee was contemplating an FCA action or even knew there was an FCA.

"efforts to stop 1 or more violations of [the FCA]."   31 U.S.C. § 3730(h)(1).

Mooney stated that he raised the issues of improper billings with Dr. Fife at their weekly one-on-one meetings on Fridays and that he confronted Dr. Fife in at least four or five of these meetings.  According to Mooney, on June 16, 2017, during one of their one-on-ones, Mooney "reiterated to Dr. Fife [his] concerns about the upcoding, explaining that [he] thought the practice created significant legal liability risk."  Viewing the evidence in the light most favorable to Mooney, we hold that there was more than sufficient evidence that Vivida was aware of Mooney's efforts "to stop 1 or more violations of [the FCA]."  31 U.S.C. § 3730(h)(1).

### 4.   Pretext

Because we hold that Mooney has satisfied the first and second elements of a prima facie claim, and because Vivida does not challenge the third element—causation—the burden shifts to Vivida to produce a legitimate, non-retaliatory reason for Mooney's termination.  If Vivida produces such a reason, the burden then shifts to Mooney to show that the proffered explanation was pretextual.  Vivida claims that it terminated Mooney's employment based on a legitimate, non-retaliatory reason "because Mooney materially breached his Employment Agreement by disclosing confidential information concerning Vivida's expansion plans."  Mooney argues that Vivida simply fails to produce a legitimate, non-retaliatory reason because "Mooney never breached confidentiality as he was accused of doing."  The parties also dispute whether the proffered explanation was pretextual.

For the purpose of pretext, "it is not important whether" the proffered reason was "*objectively* false."  *Villiarimo v.*

*Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002). "Rather, [we] only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." *Id.* (internal quotation marks and citation omitted). We nonetheless conclude that there are genuine issues of material fact as to whether Vivida "honestly believed its reasons for its actions."

*First*, in addition to the alleged breach of confidentiality, Vivida also presented several other reasons for Mooney's termination. Dr. Fife testified in his deposition that several "soft reasons" may have influenced his decision-making. These "soft reasons" include Mooney (1) being dishonest and disrespectful by telling Ms. Ohlsen that Dr. Fife called her a "f****** b****" and violating Vivida's core value of integrity,[8] (2) causing "one of [Vivida's] most talented

---

[8] When Dr. Fife was asked about Ms. Ohlsen, he testified that:

> Q   Did [Ohlsen] give you any reasons [for why she left]?
>
> A   She did. I said, you know—we were talking about it, and she reported an incident where [Mooney] was frustrated with her and he said—he said to her, "Kila [Ohlsen], this is why Dr. Fife says you are a blank, blank." And she told that to me.
>
> She said—and she's like, "Did you say that?" And I said, "Have you ever heard me swear?"
>
> So I've said a swear word, like, two times in my life. But I don't want to repeat the words right now. I'll spell them out, what she said.
>
> Q   If you can do that.

billing team members [Celia Palomata] [to leave] because of
his failure to" "get to know how [Vivida] work[s], how
[Vivida] do[es] things, to get to know the employees," and
(3) being "pretty abrasive to different staff members and not
treating people with respect."

To begin with, Mooney disputed the factual existence of
these "soft reasons." He stated that: (1) he "did meet with
people and established a good rapport with the staff and
started the process of assessing and analyzing the systems,
including billing procedures and practices"; and (2) he "was
not abrasive with the staff or anyone that [he] had dealings

---

A   F-[*-*-*-*-*], B-[*-*-*-*-]. He told her that I
called her that. And so that was a—and she was really
upset, and she was—you know, she felt like on
multiple occasions he had been aggressive towards her
and disrespectful. And, you know, that was an
instance where he was totally dishonest, because I
never said that. I don't swear. I just don't. It's not
part of my vocabulary at all. I've never said that word
ever.

And so it was a major violation of our core values,
because one of our core values is respect. That was
extremely disrespectful to her, it was extremely
disrespectful to me, and it was also a violation of our
core value of integrity, because I have never said those
words about her or about anybody.

So when I spoke with her, I—you know, I said, "I
hope you can stay. You're a great employee. You're
one of our best employees."

So she just said, "You know what? I'm so
emotional about this, and I'm just so—you know, I'm
just kind of done."

So, yes, so that was when she left.

with in [his] work for" Vivida. He also stated: "I never told Kiela [sic] Ohlson [sic], a billing employee of [Vivida], that Dr. Fife had called her a 'f****** b****.' That simply never happened." When we view the evidence in the light most favorable to Mooney—as we are required to do—the lack of support for the alternative justifications for termination *may* indicate pretext. *Cf., e.g.*, *Brazill v. Cal. Northstate Coll. of Pharmacy, LLC*, 949 F. Supp. 2d 1011, 1022 (E.D. Cal. 2013) ("Similarly, the College's inclusion of a potentially untenable explanation to its reasons for terminating plaintiff casts doubt over the overall credibility of its reasons. It gives rise to the inference that the College is attempting to dissemble a discriminatory motive for terminating plaintiff with other plausible justifications.").

Moreover, the fact that Vivida presented different justifications for Mooney's termination *may* also indicate pretext. For pretext, we generally require these justifications to be "fundamentally different" as "they suggest the possibility that neither of the official reasons was the true reason," *Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir. 1993), or "incompatible," *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1997). But we have also noted that "different reasons stated at different times" may lead "[a] rational trier of fact [to] find that these varying reasons show that the stated reason was pretextual, for one who tells the truth need not recite different versions of the supposedly same event." *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997). "It may be that [an employer]'s . . . explanations are acceptable when viewed in the context of other surrounding events. However, such weighing of the evidence is for a jury, not a judge." *Id.* (internal quotation marks and citation omitted).

*Second*, even if Vivida's alternative reasons for Mooney's termination alone did not show a triable issue of fact as to pretext, temporal proximity of the events undermines the genuineness of Vivida's proffered reason. Prior to June 1, 2017, Mooney claimed to have raised issues about improper billing practices in a few weekly meetings with Dr. Fife. On June 1, 2017, Mooney met with Dr. Landow, which was cited by Vivida as the reason for Mooney's termination. On June 16, 2017, Mooney claimed that he met with Dr. Fife and reiterated his concerns about improper billing practices. And on June 21, 2017, Vivida sent Mooney the Termination Letter.

"[T]emporal proximity"—here, in context, the relatively long time (twenty days) that elapsed between Mooney telling Dr. Fife about his supposed breach of confidentiality and his termination, and the short time between Mooney's June 16 meeting with Dr. Fife and Mooney's termination (five days)—"can by itself constitute sufficient circumstantial evidence of retaliation for purposes of . . . the showing of pretext." *Dawson v. Entek Int'l*, 630 F.3d 928, 937 (9th Cir. 2011).

Vivida argues that "if Vivida sought to retaliate against Mooney for purportedly raising issues about Vivida's billing procedures, it would have swiftly taken some adverse action against him following the . . . prior weekly meetings where Mooney allegedly 'confronted' Dr. Fife." But when viewed in the light most favorable to Mooney, Mooney's June 16 meeting *can* be interpreted as qualitatively different from the previous weekly meetings. In the previous weekly meetings, Mooney "discuss[ed] the legal risk to [Vivida]" and told Dr. Fife that "he [wa]s putting himself at risk." In the June 16 meeting, however, while Mooney "reiterated to Dr. Fife [his] concerns about the upcoding, explaining that [he] thought

the practice created *significant legal liability risk*," "[i]t was [also] clear that Dr. Fife and all involved *could have criminal or civil liability*." (emphasis added).

Because we hold that there are genuine issues of material fact with respect to pretext, we reverse the district court's grant of summary judgment as to Mooney's claim for FCA retaliation and remand that claim for trial.**[9]**

## B. The District Court Failed to View the Evidence in the Light Most Favorable to Mooney on His Breach of Contract Claim.

Mooney also brought a breach of contract claim against Vivida. Mooney alleged that "[Vivida] breached [the Agreement] when . . . Dr. Fife, acting on behalf of [Vivida], terminated Mooney's employment without cause, as that term is defined in the [Agreement]." "To succeed on a breach of contract claim, a plaintiff must show four elements: (1) formation of a valid contract; (2) performance or excuse of performance by the plaintiff; (3) material breach by the defendant; and (4) damages." *Laguerre v. Nev. Sys. of Higher Educ.*, 837 F. Supp. 2d 1176, 1180 (D. Nev. 2011). There is no dispute that the parties entered into a valid written contract. There is, however, a dispute over whether Vivida materially breached the contract intertwined with a dispute of fact over whether Vivida terminated Mooney's employment for cause. If Mooney materially breached the

---

[9] We later discuss issues relating to Mooney's supposed breach of the confidentiality provision. Looking at the evidence in the light most favorable to Mooney, there are also triable issues as to whether there was any breach of the confidentiality provision. The facts, as we view them in Mooney's favor, raise additional triable issues as to pretext, as a reasonable factfinder could determine not only that there was no breach, but also that Vivida knew there was no breach.

contract first, his claim for breach of contract cannot succeed. *See Bradley v. Nev.-Cal.-Or. Ry.*, 178 P. 906, 908 (Nev. 1919) ("[T]he party who commits the first breach of a contract cannot maintain an action against the other for a subsequent failure to perform."). But "employers are obligated to act in good faith and upon a reasonable belief that good cause for terminating a for-cause employee exists." *Sw. Gas Corp. v. Vargas*, 901 P.2d 693, 700 (Nev. 1995). "Genuine issues of material fact casting a strong doubt on the purported good-faith of the employer are ripe for a jury's consideration." *Id.*

The district court concluded that (1) the terms in the Agreement—including § 7(a) (providing that Vivida could terminate Mooney for "[c]ause"), § 7(b)(2) (defining one such "[c]ause" as a violation of any confidentiality provision), and § 8(a) (specifying the terms of the confidentiality provision)—are unambiguous, and (2) Mooney violated the terms of § 8(a). "[W]hen a contract is clear on its face, it 'will be construed from the written language and enforced as written.'" *Canfora v. Coast Hotels & Casinos, Inc.*, 121 P.3d 599, 603 (Nev. 2005) (quoting *Ellison v. Cal. State Auto. Ass'n*, 797 P.2d 975, 977 (Nev. 1990)). We have "no authority to alter the terms of an unambiguous contract." *Id.*; *see also Renshaw v. Renshaw*, 611 P.2d 1070, 1071 (Nev. 1980).

The district court cited § 8(a) of the Agreement, which it said provides that "[Mooney] could not divulge, disclose, or communicate to any person . . . information concerning the business of [Vivida], its manner of operation, its plans, processes, or other date [sic], or any information ascertained by [Mooney] through [Mooney's] employment with [Vivida]." (internal quotation marks omitted) (quoting the Agreement). The district court found that Mooney violated

§ 8(a) because "[Mooney] himself admit[ted] that a prospective acquisition of another dermatological practice would constitute 'plans' under § 8(a) . . . [and] that he told Dr. Landow that Vivida was 'in the market.'"

We hold that the district court erred because it failed to view the evidence in the light most favorable to Mooney. First, it erred because it failed to cite—let alone discuss—an important exception in § 8(a). In between the "shall not" and "divulge, disclose, or communicate" language in § 8(a) lies an exception to the general requirement not to breach confidentiality; that is, § 8(a) did not forbid Mooney to divulge, disclose, or communicate Vivida's plans when it was "required in the normal course of his engagement hereunder." The district court omitted that exception from its quotation of § 8(a).

When we view the evidence in the light most favorable to Mooney, a reasonable jury could conclude that any disclosure that Mooney did make to Dr. Landow, even if confidential, was required in the normal course of his engagement. If so, then there was no breach of § 8(a). Vivida had been "looking at acquiring [Dr. Landow's] practice and then having him work part-time." When Mooney went to Dr. Landow's practice "under the direction of Dr. Fife," "Dr. Landow agreed for [Vivida] to be there to do an analysis of his practice." The undisputed purpose was for Vivida to look at acquiring Dr. Landow's practice. Oral Arg. 21:46–21:53. And Mooney "went into Dr. Landow's office" with at least three other employees from Vivida. According to Mooney, he did not approach Dr. Landow. Instead, forty-five minutes after he went into Dr. Landow's office, Dr. Landow came out and talked to Mooney. Mooney testified in his deposition that Dr. Landow said that he understood Vivida was looking at Dr. Schreiber's practice

and he had an issue with that. Rather than confirming or denying whether Vivida was acquiring Dr. Schreiber's practice, Mooney replied, "we are *in the market* as you know because we're here looking at your practice and if you have any issues or concerns please address them with Dr. Fife." (emphasis added). Mooney also testified that "Dr. Landow asked me if we were purchasing or going to acquire or do anything with Dr. Schreiber and I said as I've said a couple of times here, [Vivida] is looking at a lot of different things as you know and if you have any concerns about anything please give Dr. Fife a call."

A reasonable jury could well conclude that Mooney's responses to Dr. Landow's questions were appropriate and, even if somehow were disclosing confidential information, did not breach § 8(a) because Mooney went to Dr. Landow's office and interacted and spoke to him "in the normal course of his engagement." And a reasonable jury could conclude that if Mooney had refused to respond to Dr. Landow, he would have been acting in a way that might well have upset Dr. Landow, perhaps enough to terminate discussions in violation of Mooney's contractual obligations. Again, in the light most favorable to Mooney, Mooney was answering a question in a circumspect manner.

Second, the district court also failed to view the evidence in the light most favorable to Mooney as to whether he even disclosed any confidential information. In the light most favorable to Mooney, he did not mention Dr. Schreiber. Mooney conceded that he said "we are in the market as you know." The district court focused on this as disclosing confidential information. But again, in the light most favorable to Mooney, that wasn't (and couldn't have been) confidential to Dr. Landow, because Dr. Landow knew Fife was looking at acquiring Dr. Landow's practice. Indeed,

Mooney testified that at one point "Dr. Fife had a meeting at his office after hours and . . . introduced [Mooney] to [Dr.] Landow[ and] told [Mooney] that [Dr. Fife] was interested in purchasing his practice." And "[Dr. Fife] said he was looking at other practices." According to Mooney, "it was not something that was completely confidential about what [Vivida] was in the business or looking to do to expand the practice."

We thus reverse the district court's grant of summary judgment on Mooney's claim for breach of contract.

## C. We Also Reverse the District Court's Summary Judgment on Mooney's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.

Mooney next argues that the district court erred in granting summary judgment on his claim for breach of the implied covenant of good faith and fair dealing. "An implied covenant of good faith and fair dealing exists in every Nevada contract and essentially forbids arbitrary, unfair acts by one party that disadvantage the other." *Frantz v. Johnson*, 999 P.2d 351, 358 n.4 (Nev. 2000).

> With respect to the covenant of good faith and fair dealing, [the Nevada Supreme Court] ha[s] stated that "when one party performs a contract in a manner that is unfaithful to the purpose of the contract and the justified expectations of the other party are thus denied, damages may be awarded against the party who does not act in good faith."

*Perry v. Jordan*, 900 P.2d 335, 338 (Nev. 1995) (alteration omitted) (quoting *Hilton Hotels*, 808 P.2d at 923). A

contractual breach of the implied covenant of good faith and fair dealing occurs "[w]here the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract." *Hilton Hotels*, 808 P.2d at 922–23.

As Mooney concedes in his appellate briefs, the claim for breach of the implied covenant of good faith and fair dealing "is . . . brought in the alternative," and "[i]f a breach of contract is found by the jury[,] then this . . . claim will not be necessary."

For the same reasons we discuss above with respect to the breach of contract claim, we also reverse the district court on Mooney's claim for breach of the implied covenant of good faith and fair dealing. There are genuine issues of material fact as to whether Vivida deliberately countervened the intention and spirit of the contract. *See Consol. Generator-Nev., Inc. v. Cummins Engine Co.*, 971 P.2d 1251, 1256 (Nev. 1998) (holding that "good faith is a question of fact" and, because it held that "a genuine issue of material fact exists as to whether Cummins breached" the contract, "correspondingly hold[ing] that a genuine issue of material fact exists as to whether Cummins breached its implied covenant of good faith and fair dealing in" that contract).

## IV. CONCLUSION

For all these reasons, we **REVERSE** the district court's grant of summary judgment on all three of Mooney's claims and **REMAND** to the district court for further proceedings consistent with this opinion. Because Vivida is not a "prevailing party" under § 13(h) of the Agreement, we **VACATE** the district court's order granting Vivida's motion for attorneys' fees.

COLLINS, Circuit Judge, concurring in part and in the judgment:

I concur in the court's opinion except for its holding that the "subjective" and "objective" components of the test for "protected activity" that we adopted with respect to the prior version of the False Claims Act ("FCA") in *Moore v. California Institute of Technology Jet Propulsion Laboratory*, 275 F.3d 838, 845 & n.1 (9th Cir. 2002), also apply in determining whether an employee engaged in protected conduct in the form of "efforts to stop 1 or more violations" of the FCA, 31 U.S.C. § 3730(h)(1). This latter phrase, which references "1 or more violations" that the employee is endeavoring to "stop," seems to suggest a stronger objective component than the one we described in *Moore*. But I ultimately need not take a position on that issue because, even assuming *arguendo* that Mooney had to show that the company was likely engaged in FCA violations that he made efforts to stop, I think his evidence was sufficient to raise a triable issue of fact on that score. On that basis, I concur in the court's opinion in part and in its judgment.